**NOVELL, INC., Plaintiff**

v.

**NETWORK TRADE CENTER, INC. and Mark Bondiett, Defendants.**

**No. CIV. 95–C–523G.**

United States District Court,
D. Utah,
Central Division.

Oct. 22, 1998.

Robert S. Clark, Jeffrey J. Hunt, D. Craig Perry, Parr, Waddoups, Brown, Gee & Loveless, Salt Lake City, UT, for Plaintiff.

Denver C. Snuffer, Timothy Miquel Willardson, Nelson, Snuffer & Dahle, Sandy, UT, for Defendants.

## ORDER AFFIRMING REPORT AND AWARD OF SPECIAL MASTER

J. THOMAS GREENE, District Judge.

This matter is before the court on defendants' Objections to Report of Special Master and plaintiff's Motion for Entry of Judgment Based Upon Report of Special Master. Both sides submitted to the court extensive memorandums of law and other materials following

the filing of "Report of Special Master" dated June 22, 1998. The Objections and Motion were argued at a hearing on August 27, 1998. Plaintiff was represented by Robert S. Clark, Jeffrey J. Hunt and D. Craig Perry of Parr, Waddoups, Brown, Gee & Loveless, and defendants were represented by Denver C. Snuffer and Timothy Miquel Willardson of Nelson, Snuffer & Dahle. After argument, the case was submitted for decision and taken under advisement.

## STANDARD OF REVIEW

This is a proceeding pursuant to Rule 53(e)(2) Fed. R. Civ. Proc. which provides that "the court shall accept the master's findings of fact unless clearly erroneous." In its Order of Appointment and Reference to Special Master, this court gave notice to the parties that factual findings would be reviewable under a "clearly erroneous" standard and that legal conclusions would be subject to de *novo* review. The Supreme Court in *Anderson v. City of Bessemer City, N.C.,* 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) defined the "clearly erroneous" standard thusly:

> If the [fact finder's] account of the evidence is plausible in light of the record viewed in its entirety, the [reviewing court] may not reverse it even though convinced that had it been sitting as trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous.

407 U.S. at 573, 92 S.Ct. 2219. Accord, *Thompson v. Rockwell International Corp.,* 811 F.2d 1345 (10th Cir.1987) and *Gottlieb v. Barry,* 43 F.3d 474 (10th Cir.1994).

## SCOPE OF PROCEEDINGS

This court determined liability issues in its Memorandum Decision and Order dated August 18, 1997, and Partial Summary Judgment dated October 29, 1997. On January 30, 1998, by Order of Appointment and Reference to Special Master, the Special Master was directed to "conduct proceedings, receive evidence, and make findings of fact and conclusions of law on all matters relating to damages." This court's Order of Reference to the Special Master also authorized determination of "the extent of the infringement and damages," which the Special Master correctly regarded as relating to quantum of damages and the impact of wrongful actions, rather than re-determination of liability or the nature of the infringement. The Special Master refused to re-examine issues of liability already determined by the court and focused "on the economic evaluation of Novell's damages and the defendants' profits, and any factors which would make those measures inaccurate, incomplete compensation or unreliable." (Special Master Report, p. 8.) This court determines that the scope of proceedings as interpreted by the Special Master was legally and factually correct.

## I. *DEFENDANTS' OBJECTIONS TO REPORT OF SPECIAL MASTER*

Defendants' objections to the report of the Special Master will be considered seriatim.

### A. *Adoption of this Court's Findings of Fact*

As a predicate for the hearings which were conducted, the Special Master summarized this court's findings pertinent to damages as contained in the court's Memorandum Decision and Order dated August 18, 1997. These are set forth under paragraph headings "A" through "G" on pages 2 through 7 of the Special Master's report. Contrary to defendants' contention that the factual summaries are "inaccurate," "misleading," and "incomplete," on review this court finds that each of the factual summaries accurately represents the language and intended meaning of the said prior findings. None were taken out of context or misused by Special Master Nuffer in any way.

### B. *Relevant Products, Parties and Time Periods*

— Relevant Products

■ The relevant product in these proceedings is the computer software developed by Novell known as NetWare. Defendants sold Novell NetWare as an *upgrade* software product, whereas Novell sold NetWare as an *original license product.* The Special Mas-

ter found that defendants advertised, marketed and sold various versions of Novell NetWare during the relevant time period. (Finding # 1) He concluded that notwithstanding the different versions of NetWare, damages and lost profits calculations should reflect defendants' sales of all NetWare regardless of version. (Conclusion # 2) On review the court finds that the Finding is supported by the evidence and is not clearly erroneous, and that the Conclusion is correct as a matter of law.

— Parties

█ Notwithstanding defendants' contention that Network Trade Center, Inc. (NTC) ceased doing business in 1994 and that thereafter all business was conducted by an alleged trust known as the Network Trade Center Trust (Finding # 2), the Special Master concluded that NTC and Bondiett were the proper parties before the Court (Conclusion # 3) and that there was no credible evidence of conduct of operations by the alleged trust. In this regard, defendants object to the Special Master's findings at paragraphs 4 through 26 as "gratuitous" and "irrelevant" relating to the Network Trade Center Trust.

Defendants claim that since Network Trade Center, Inc. (NTC) and Mark Bondiett (Bondiett) were and are the sole defendants in this action and that they alone were found by this court to be liable to plaintiff, findings and determinations by the Special Master concerning the trust were improper. This court found that the said defendants continued to use Novell's marks in its advertising even after plaintiff demanded immediate discontinuance in July 1994, knowing that they were not authorized to do so. There was no genuine issue before the Court as to the role of the trust and it was manifest that defendants were continuing to infringe plaintiff's trademark.

The Special Master's findings in question speak to the sales and business operations which were conducted after July 1994. Defendants claimed that the purported trust was the bona fide successor of defendants and that it conducted all business activities beyond 1994. The Special Master found otherwise, and that the defendants rather than the alleged trust continued operations and sales infringing plaintiff's marks. Special Master Nuffer concluded that Bondiett and NTC were the proper parties before the court and that each are fully liable for all monetary recoveries which were awarded [Conclusion # 3]. Findings were appropriate and necessary in order to determine not only whether the infringement of Novell's trademarks which continued after 1994 were carried on by defendants or the purported trust, but to determine the time period in which damages were sustained by Novell and the quantum of damages which were incurred. This involved, among other things, determination of credibility of witnesses which only the trier of fact may ascertain.

This court determines that the findings in question were relevant, amply supported by the record and not clearly erroneous, and that the Special Master's conclusions relating thereto were correct as a matter of law.

— Time Period

The Special Master found that the relevant time period for calculating damages and all other monetary recoveries was at least from October 1992 through at least the end of December 1996 and that plaintiff is entitled to recover damages which were incurred during that period (Conclusions # 4 and 5). This is amply supported in the record factually and is not clearly erroneous, and it is correct as a matter of law.

C. *Nonproduction of Documents. Unavailability of Evidence and Destruction of Evidence*

— Nonproduction of Documents

█ Documents relating to the purported existence and business activities of the "Network Trade Center Co. Trust" as well as other matters were the subject of a Motion to Compel which was granted by the court on November 18, 1996. This required NTC to produce requested records and to answer interrogatories. Defendants failed to produce the documents including a purported purchase order for $3 million in 1995 by NTC with Ingram Micro, as well as sales pursuant thereto. Defendants tried to excuse non compliance with the court order by claiming that "a party may not, under the local rules,

complain about a failure to cooperate in discovery unless the offending party is first given a reasonable chance to cure" citing DUCiv. 37–1(a) and (b). Those rules deal with informal conferences designed to settle discovery disputes. The matter became moot when the court order was issued. Defendants' reliance thereon as a reason not to produce the documents at the hearing before the Special Master is wholly misplaced because the court had already granted the motion to compel production of the very documents in question. The Special Master, based on amply testimony, determined that the documents in question as well as other records intentionally were not produced.[1] Clearly, defendants had a duty to produce and could not shift the burden to plaintiff.

— Unavailability of Evidence

Defendants failed to produce pertinent financial information claiming that it was un-

available. The Special Master found that these financial records were intentionally hidden from plaintiffs or destroyed in an effort to keep damaging information from plaintiffs.[2] The record supports that finding.

— Destruction of Evidence

The record reflects that NTC kept detailed financial records, but shredded those records, hid them or took them off the premises after this lawsuit was initiated.[3] Specifically with respect to the destruction of documents, Mr. Raymond T. Nielson, an NTC accountant, testified that Mr. Bondiett "didn't want to have anything found on the premises [or] anything that could hurt him basically." [Tr. 126:21–23] Mr. Nielson further testified that "everything was to be destroyed or to be taken off the premises." [Tr. 127:4–7] Other former employees of NTC testified similarly.[4]

■ All of the aforesaid amply supports the Special Master's finding that defendants'

---

1. The record reflects that NTC kept detailed sales and financial records and that defendants intentionally hid, destroyed or otherwise impeded the production of their records. The Special Master's findings as to these matters was amply supported. In this regard, at the time Mr. Babbel left NTC, a computer hard drive containing complete financial data was at NTC's offices. (Finding # 35)

2. Defendants failed to produce a complete set of sales invoices for the entire time period in question. (Finding # 38 on pg. 15.)

 Defendants failed to produce complete monthly sales report records which would have made a more precise calculation of defendants' sales and profits possible. (Finding # 42 on pg. 15.)

 Defendants produced only some customer invoices for January through October 1994. Defendants produced no customer invoices for November 1994 through December 1996. Defendants failed to produce a complete set of documents relating to NTC's purchases of NetWare from Ingram Micro. (Finding # 39)

 Defendants failed to produce any financial information for 1996. (Finding # 40)

3. * Bondiett frequently shredded NTC documents and instructed others to do likewise. The lawsuit with Novell was mentioned in connection with the shredding policy, and continued after Novell filed this lawsuit. (Findings # 31, # 32 and # 33)

 * Bondiett, while in the act of consulting with his attorney, and preparing to respond to a request for production of documents in this lawsuit, shredded financial documents. (Finding # 34)

 * Bondiett asked Mr. Utz to hide NTC's file server containing the NTC's financial information in the rafters of NTC's offices. (Finding # 36)

 * Around the first of December 1996, NTC sales and accounting information was downloaded to Bondiett's personal computer at Bondiett's request. (Finding # 37)

4. Testimony of David Babbel

 Q. "Did [Bondiett] ever mention Novell or this lawsuit in [regard to shredding documents]"?

 A. "Always."

 Q. "Okay. What did he say in that regard?"

 A. "He didn't want anything to be found in the garbage. He didn't want to have anything found on the premises [or] anything that could hurt him basically."

 Q. "And so your testimony—so that I understand and your testimony is clear: The monthly financial reports were, in fact, generated during the period of your employment, were they all destroyed during that time as well?"

 A. "Most of them probably were … My understanding was everything was to be destroyed or to be taken off premises." [Tr. 126:17–24; 127:3–8]

 Testimony of Keith Utz

 Q. "Did Mr. Bondiett ever have a conversation with you about Novell in connection with the destruction of documents?"

failure to produce complete financial and sales documentation for the period in question made precise calculation of Novell's lost profits impossible. [Finding # 43.] The Special Master concluded that such non production should not benefit defendants and that "gaps in the data available to calculate damages and profit amounts should be filled by a presumption against the party not producing such data." [Conclusion # 8]

This court determines that the Special Master's findings with respect to the nonproduction, unavailability and destruction of relevant documents were not clearly erroneous, and that the Special Master's conclusions relating thereto were correct as a matter of law.

### D. Calculation and Award of Defendants' Profits

— Calculation

■ Defendants object to the manner in which the Special Master calculated profits because of alleged double counting of receipts and inclusion of the entire purchase order placed with Ingram Micro in July 1995. The alleged double counting related to net operating income for 1994. The Special Master based that figure upon tax returns, financial records and the testimony of Novell's experts. He found the testimony of NTC's expert not to be credible, and further that the testimony was not competent because it was based on incomplete sales records. These findings by the Special Master are supported in the record.

With respect to a sizable order placed with Ingram Micro which was included in the calculation, substantial evidence was presented to support inclusion of the entire purchase order in defendants' revenues. In this regard, the Special Master noted that Ms. Laura Englyng, a former Ingram employee, who was responsible for the NTC account, testified at the hearing that NTC's order was fully honored. [Finding # 50] Ms. Englyng

wrote that "Ingram has and will continue to honor any pre-existing orders placed prior to July 21, 1995." [Letter from Englyng to Bondiett dated September 8, 1995—Exh. # 80] Defendants contend that other deposition testimony by Ms. Englyng and statements by Ms. Margaret Logue refute the Special Master's finding.[5] However, the Special Master weighed the evidence relative to this matter and came to a different conclusion. This was a permissible view of the evidence which was amply supported in the record. The Special Master's choice in this regard was not clearly erroneous.

· Concerning calculation of defendant's profits for the year 1996, the record supports the Special Master's finding that defendants failed to produce any financial information for 1996 [Finding # 40], or any documentation substantiating net income during 1996. [Finding # 49] Because of defendant's failure to produce such documentation, the Special Master relied upon sales invoices of Ingram Micro, purchase orders and extrapolations from information available from previous years. [Finding # 49] This was reasonable and the resulting calculations were supported and plausible in the light of the entire record. Net operating income for the years 1992, 1993, 1994 and 1995 was based upon defendants' tax returns and financial records as well as expert testimony.

This court determines that the calculation of defendants' profits as set forth by the Special Master was not clearly erroneous.

— Award

Based upon the aforesaid calculations, the Special Master adopted conservative and minimum numbers rather than the highest credible estimates in determining defendants' net profits, and found that Novell was entitled to an award of $6,899,945 which represented a conservative calculation of those net profits. [Finding # 23] This amount was adjusted and deducted from the lost profits

A. "He mentioned that Mr. Willardson was coming over so they could go through the documents and filter out what they didn't want to give to Novell."

Q. "You mentioned that Mr. Bondiett said that he was going to filter out the documents

relating to this document production. Did you see Mr. Bondiett do this filtering?"

A. "Yes." [Tr. 360:14–16; 361:7]

5. (Englyng Deposition pgs. 48, 67–68 and Logue Deposition pgs. 35–37.)

which the Special Master found Novell to have suffered. [Conclusions # 28, # 38] The Special Master concluded that it would amount to unjust enrichment if defendants were allowed to retain profits from the sale of Novell's NetWare products because such sales were made in connection with the wrongful use of plaintiff's marks and defendants' unfair competition and false advertising. [Conclusion # 15]

Calculation of the award and the award is supported by the record and not clearly erroneous, and the legal conclusions relative thereto are correct as a matter of law.

### E. *Award of Novell's Damages*

#### 1. Novell's lost profits

■ Defendants contend that the Special Master had no factual basis upon which to compute Novell's alleged lost profits, and that the determination was "pure speculation." The record speaks otherwise. Novell presented competent evidence of revenue loss as to what would have been realized on a sale of original license NetWare as compared with each sale of upgrade license software by or through defendants, as well as estimates with regard to the number of NetWare upgrades sold by defendants. Based upon this evidence, the Special Master calculated Novell's lost profits.

The Special Master found that price elasticity of demand for Novell NetWare among the purchasers from defendant NTC was low, and that an assumption of a one-to-one correlation between defendants' sales of the Net-Ware upgrade product and Novell's lost sales of the original license NetWare was reasonable. [Finding # 63] Defendants called Mr. Hashimoto as an accounting expert, but he rendered economic opinions such as claimed price sensitivity rather than inelasticity. He also opined that the concept of price elasticity of demand was irrelevant. The Special Master rejected or discounted this testimony as improper expert testimony by an unqualified person to opine as to price sensitivity or price elasticity issues.[6] [Findings # 59–61

and Conclusions # 29–31] The Special Master found Novell's experts to be qualified to offer expert economic testimony, and based thereupon determined that each of the sales of upgrade Network product by defendants caused the loss of an opportunity by Novell to sell an original license NetWare product. [Conclusions # 32, 35] The number of unit sales during the period 1992 through 1996 was established in the record, as was the price relative to sales by Novell of NetWare. [Conclusion # 38]

Based upon all of the evidence presented, the Special Master awarded plaintiff $20,-193,860 in lost profits, from which defendants' profits were deducted, for a net award of lost profits to plaintiff in the amount of $13,293,915. [Conclusions # 38 and Exh. A attached to the Report]

The Special Master's findings concerning computation of plaintiff's lost profits are not clearly erroneous, and the net award of plaintiff's lost profits is plausible based upon the entirety of the record, and not incorrect as a matter of law. The Special Master's finding that defendants' liability was not mitigated by the possibility that some of defendants' customers may have purchased from other unauthorized dealers was not clearly erroneous.

#### 2. Novell's Lost Good Will

■ The record supports the Special Master's determination that loss of good will was suffered by Novell among its distributors, resellers and consumer end users. Evidence was presented that substantial confusion arose as a result of NTC's sales practices, and Novell received numerous complaints as a result. These complaints came from end users as well as authorized distributors and resellers. The Special Master recognized that good will is impossible to quantify but that it was clearly adversely affected, and regarded it as a proper basis to enhance the award. The award of $500,000 for loss of good will was justified, reasonable and plausible based upon the totality of the record.

---

**6.** Defendants admit that Mr. Hashimoto was unacquainted with the concept of price elasticity of demand. (Defs.Memo. p. 13)

### 3. Corrective Advertising

■ The Special Master awarded an amount to Novell for corrective advertising even though no corrective advertising was conducted by plaintiff. [Conclusion # 42] This was based upon the calculation of one-fourth of the amount defendants spent in advertising Novell's NetWare, within parameters set by the Tenth Circuit where no specific corrective advertising costs is incurred by the wronged party.[7] The Special Master concluded:

> Damages for corrective advertising where plaintiff has not yet made any specific corrective advertising expenditures are calculated by a formula which takes the amount defendant spent on advertising the infringing product and divides that figure by four.

[Conclusion # 43]

The award was plausible from the entirety of the record and was legally correct.

### F. *Defendants' Intent and Willfulness*

■ Defendants contend that there was no basis in the record to support a finding of bad intent on the part of NTC or Bondiett. This court previously entered findings sufficient to impute willfulness to defendants based in part upon defendants' knowledge of their false and unauthorized advertising and continuation of such after notification to quit, and material deception of end users. (Finding G, p. 7) The Special Master observed the witnesses, determined credibility and entered findings supported by substantial evidence that defendant Bondiett's testimony that NTC ceased business operations in March 1994 was not credible and that advertisements thereafter bearing the name of "Network Trade Center, Inc." were not simply mistakes by publishers. (Finding # 26) The Special Master further found the testimony of the purported trustee of the alleged trust not to be credible and to be "contradictory evasive and unclear." (Finding # 15) The Special Master found the testimony of former employees of NTC to be honest and credible concerning nonproduction of documents and unavailability of evidence (Finding

# 27), and concluded that defendants "engaged in intentional concealment of their conduct, destruction of financial records and other documentation of infringing activities." (Conclusion # 9) The Special Master's said findings were not clearly erroneous, and the conclusions were correct as a matter of law. The Special Master also concluded that defendants' conduct resulted in concealment of their activities, unavailability or destruction of financial records and documentation of the infringing activities, and an attempt to avoid responsibility through purported transfer of assets to an illusory offshore trust [Conclusion # 50] This also amounts to a finding as to such matters by the Special Master which is supported by substantial evidence and not clearly erroneous, as well as a conclusion which is correct as a matter of law.

The record shows that defendants deliberately and intentionally caused confusion with intent to deceive customers when misrepresenting their upgrade products to be originals. [Tr. 159:21–161:6; 176:20–177:10; 178:4–16; 404:13–405:4.] This action actually deceived customers in some instances, and evidence of product returns and complaints from end users shows that the likelihood of confusion was real. In addition, the defendants continued to use Novell's trademark even after they received notice of plaintiff's objection. Defendants do not allege that plaintiff's trademark is invalid, or that they had no knowledge of its existence. Instead, the record reflects that defendants knowingly and brazenly continued illegal use of Novell's trademark simply to further their profits.

The factual record also shows that defendants failed to produce pertinent financial information claiming it was unavailable and that documents were intentionally hidden in an attempt to keep harmful information from the plaintiffs. [Tr. 858:10–859:1; 688:1–689:3; 364:21–365:17; 420:21–421:15] Furthermore, the record reflects that other detailed financial records kept by NTC were shredded, hidden, or taken off the premises after this lawsuit was initiated. [Tr. 360:4–361:24; 352:12–354:7; 380:3–383:7; 126:3–19]

---

7. *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365 (10th Cir.1977).

In addition to the foregoing, the factual record is replete with evidence that Bondiett and NTC attempted to avoid liability through the creation or attempted creation of an offshore trust which was illusory and not bona fide. Defendants claim that NTC's assets were sold to the Trust in June 1994, yet all advertisements after June 1994 mention "NTC" rather than the trust, and no trust applications were filed by defendants in the State of Utah in the name of "Network Trade Center" until 6/3/97. [Trial exhs 7–20, 23–26, 31, 38–40, 69.] Despite defendants' claims that NTC closed up in 1994, thereafter defendant Bondiett registered to do business in the State of Washington under the name "Network Trade Center". Mr. Bondiett claimed in the application that NTC had been doing business there since 11/94. [Trial exh 70].

Based upon the foregoing and a review of the record, it is apparent that sufficient evidence exists to uphold all of the aforesaid findings of fact made by the Special Master. None were clearly erroneous.

### G. Attorneys' Fees

Defendants contend that the standard for awarding attorneys' fees has not been met because there has been no appropriate finding of willfulness. However, the Special Master determined that this is an exceptional case within the meaning of 15 U.S.C. § 1117 warranting attorneys fees [Conclusion # 51]. Findings of intentional wrongful conduct are abundantly supported in the record and not clearly erroneous, and the Master's conclusion is not incorrect as a matter of law.

### H. Adjustment of Awards

■ The Special Master correctly determined that under the circumstances of this case the monetary award may be increased, up to treble damages [Conclusion # 53 and # 56]. The Master further determined that harm to the plaintiff's goodwill and reputation was not quantifiable and that proof of profits or damages was otherwise imprecise [Conclusion # 54]. In the exercise of broad discretion the Special Master increased the award by $500,000. This represented an increase of a small percentage, less than 5% of the total award, and was amply supported by the entirety of the record, and not clearly erroneous and not incorrect as a matter of law.

## II. CONCLUSIONS OF LAW

### A. Presumption of Damages

■ It is manifest and this court rules that plaintiff met its burden of proof in all respects concerning the calculations and award rendered by the Special Master. The court finds that defendants failed to meet their burden of proof to overcome the presumption in law that all of its sales were due to the selling power of plaintiff's trademark. Defendants contend that the Special Master ignored evidence which rebuts the presumption. However, Defendant at trial merely suggested a possibility that Novell's trademark had no special selling power, and that special characteristics of defendants' products caused the sales. The characteristics mentioned by Defendants were free telephone technical support, timely shipping with costs included in the product price, immediate order fulfillment, and money back guarantees. [Tr. 546–547, 564–568, 891–893.] Defendants attempt to throw doubt on the selling power of Novell's trademark and product falls far short of carrying and satisfying their burden of showing that NTC's sales took place because of its distinct product apart from the value of the Novell mark which it used. Also, defendants did not show that Novell's sales were not due to the selling power of Novell's trademark.

■ The Special Master's conclusion of law # 20 states, "it is a general presumption that all of an infringer's sales of goods bearing an infringing mark are due to the selling power of the mark and not due to any other cause." This court agrees with and adopts this legal principle. The legal basis for the presumption was established by the Supreme Court in *Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 62 S.Ct. 1022, 86 L.Ed. 1381 (1942), in which the court held

> Infringement and damage having been found, the Act requires the trade-mark owner to prove only the sales of articles

bearing the infringing mark ... The burden is the infringer's to prove that his infringement had no cash value on sales made by him. If he does not do so, the profits made on sales of goods bearing the infringing mark properly belong to the owner of the mark. There may well be a windfall to the trade-mark owner where it is impossible to isolate the profits which are attributable to the use of the infringing mark. But to hold otherwise would give the windfall to the wrongdoer ... [I]t promotes honesty and comports with experience to assume that the wrongdoer who makes profits from the sales of goods bearing a mark belonging to another was enabled to do so because he was drawing upon the good will generated by that mark.

316 U.S. at 205–207, 62 S.Ct. 1022.

## B. *Willfulness and Bad Intent*

This court has reviewed the Special Master's conclusions of law and the record concerning the intention and willfulness of the defendants. The Special Master concluded that much of defendants' conduct was the result of intentional concealment including concealment of documentation of infringing activities. On de novo review, this court concludes that in addition to the legal conclusions of the Special Master concerning defendants' intent (Conclusion # 9), defendants' actions were willful as a matter of law.

 Willfulness is a term defined by the courts in trademark infringement cases as conduct showing a "deliberate and intentional design to cause confusion and mistake to deceive purchasers." *National Lead Co. v. Wolfe,* 223 F.2d 195, 205 (9th Cir.) *cert. denied,* 350 U.S. 883, 76 S.Ct. 135, 100 L.Ed. 778 (1955). A defendant acts willfully, or in bad faith, if he knows of plaintiff's mark and fails to cease using it after notification from plaintiff. *Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.* 80 F.3d 749 (2d Cir.1996). In this regard, the Tenth Circuit similarly has held that continued use of a service mark after notice of infringement constitutes willful conduct. *Takecare Corporation v. Takecare of Oklahoma, Inc.,* 889 F.2d 955 (10th Cir.1989). See also *VIP Foods, Inc. v. Vulcan Pet, Inc.,*

675 F.2d 1106 (10th Cir.1982) (defendant's intent to deceive or confuse the public constitutes willfulness and an exceptional circumstance justifying attorney fees under 15 U.S.C.A. § 1117).

The existence of willfulness has a bearing on aspects of the award by the Special Master as follows:

*Alleged Overlapping Recovery of Damages and Profits*

 The Lanham Act, 15 U.S.C. § 1117, permits cumulative recovery of both profits and damages where the offending party's conduct is willful. Based on this court's finding that defendants' conduct was willful Novell would be entitled to receive both its lost profits by way of damages and NTC's profits. However, in fact, Novell was not awarded both. The Special Master noted in his report that recovery under the Lanham Act is principally compensatory and that awards must be based on logically consistent calculations. He therefore refused to allow Novell to recover for both defendants' profits and damages for Novell's lost profits had defendants not been in the marketplace. As a result, the gross loss of profits for Novell ($20,193,-860) was reduced by the amount of defendants' profits ($6,899,945) in order to avoid recovery under two inconsistent theories. Therefore, although Novell was theoretically entitled to cumulative recovery, in fact such was not awarded. Accordingly, notwithstanding defendants' willful conduct there was no cumulative and overlapping award of Novell's full damages and defendants' profits. The court approves the action of the Special Master in this regard.

*Defendants' Profits*

 A finding of unjust enrichment in a proper case, or willful conduct may justify an award of an offending defendant's profits to plaintiff in case of unlawful advertising. Where the award is based on unjust enrichment, it must be shown that the products in question compete. *Aktiebolaget Electrolux v. Armatron International, Inc.,* 999 F.2d 1 (1st Cir.1993). Defendant contends that the products sold by Novell were not in competition and therefore did not compete with NTC's product because they are in fact iden-

tical. However, the record reflects that some purchasers of NTC's product did confuse them with Novell's product, and that the two products served the same function and are within the same category of consumer goods. The fact that they are completely identical strengthens the point that had NTC not been in the market defendants' profits would otherwise have gone to Novell. The Special Master awarded to plaintiff the profits realized by defendants on the theory of unjust enrichment, and this court approves the award on that basis because the two products directly competed. However, the award is also justified on the basis of the conclusion by this court as a matter of law that defendants' conduct was willful.

### Corrective Advertising

The Tenth Circuit has held that it is appropriate for an award of damages to include the necessary cost of corrective advertising to remedy consumer confusion caused by defendant's infringing activity, particularly when false advertising was the medium. *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365 (10th Cir.). Defendants contend that this award is merely a punishment for their willful conduct because Novell did not proffer evidence of monies spent on corrective advertising. However, the law does not require Novell to make specific expenditures for corrective advertising in order to receive an award for such. Where no expenditures for corrective advertising are made, the court uses a formula which takes the amount defendant spent on advertising the infringing product and divides that figure by four. *Big O Tire Dealers*, 561 F.2d at 1375–76. The Special Master found that Novell is entitled to $337,996, one-fourth of the $1,351,982 expended by defendants. The court's determination that Defendants' conduct was willful is not relevant to whether Plaintiff receives an award for corrective advertising. This award is not a punishment but rather corrects the effect of Defendants' false advertising and unfair competition.

### Attorneys Fees

 The finding of defendants' willfulness does bear upon whether plaintiff can receive an award of attorney's fees. Under 15 U.S.C. § 1117(a), the court may award attorney's fees in "exceptional" circumstances. Legislative history suggests that an exceptional case is one where the trademark infringement can be characterized as "malicious", "fraudulent", "deliberate" or "willful". *VIP Foods, Inc. v. Vulcan Pet, Inc.*, 675 F.2d 1106, 1107 *citing* S.Rep. No. 93–1400, 93rd Cong., 2d Sess., reprinted in (1974) U.S.Code Cong. & Ad, News 7132, 7133. The Special Master found that the circumstances of this case qualifies it as an exceptional case. This court has approved that finding and rules that defendants' willful conduct qualifies this case as "exceptional" within the meaning of the Act. Accordingly, Novell is entitled to recover its attorneys fees which were reasonably and necessarily incurred in this action from January 30, 1998–the date of entry of Order of Appointment and Reference to Special Master until entry of Judgment, October 22, 1998.

### Award Enhancement

 An award of treble damages does not depend exclusively on a finding that defendant's conduct was willful. For example, Section 15 U.S.C. § 1117(a) allows a court to award more than the actual damages shown, not to exceed three times that amount, if it finds that plaintiff's recovery based on defendant's profits is inadequate. Although willfulness also justifies treble damages, what is awarded should constitute compensation and not a penalty. *Nintendo of Am. v. Dragon Pac. Int'l*, 40 F.3d 1007, 1009–11 (9th Cir. 1994).

In the case before us, actual damages are quantifiable within reasonable certainty. The Special Master stopped far short of awarding treble damages, but did enhance the award by allowing recovery for harm to its goodwill. This court has approved that award of an additional $500,000 because of inadequacy of plaintiff's award to reflect the harm done to plaintiff. This award is justified under 15 U.S.C. § 1117(a) as well as defendants' willful conduct.

The court has reviewed de novo each of the conclusions of law set forth by the Special Master, and finds them to be correct. De-

fendants contend that the Special Master's decision is not supported by the case law cited. The court has reviewed the cases and determines that the Report is properly grounded in relevant and analogous legal authority, and that the cases cited support the conclusions of law.

### III. *PLAINTIFF'S MOTION FOR EN-TRY OF JUDGMENT BASED UPON REPORT OF SPECIAL MASTER*

The court's discussion of the Objections by defendants to the Special Master's Report applies equally to plaintiff's motion, except as to the modifications urged by plaintiff which would enlarge the award rendered, and the matter of joint and several liability of defendants Bondiett and NTC.

#### A. *Modification to Award Urged by Plaintiff*

With respect to further award enhancement, plaintiff urges as a modification that compounding of interest would be appropriate. Plaintiff recognizes that under federal law the determination to award compound interest is solely at the discretion of the court. This court finds that the Special Master appropriately determined that the circumstances of this case do not necessitate such a calculation. This court also agrees with the Special Master's determination that the prime rate sufficiently reflects the economic consequences of defendants' conduct to adequately compensate plaintiff, rendering adjustments using market rate of interest unnecessary.

This court determines that the Special Master's $500,000 enhanced damage award was justified by evidence of customer complaints, frustration and potential loss of business, and was an appropriate and permissible exercise of the Special Master's discretion. The enhanced award without any further enhancement is adequate to further compensate Novell and may stand as is. This court agrees with the award as rendered and rejects plaintiff's requested modifications.

#### B. *Joint and Several Liability*

After due consideration, notwithstanding anything in past proceedings to the contrary or lack of specific ruling, this court determines that liability for the awards herein approved should be joint and several as between the defendant NTC and the defendant Bondiett. Both are fully liable.

Based on the foregoing, it is hereby

ORDERED, that defendants' "Objections to Report of Special Master" be and hereby are overruled and DENIED; it is

FURTHER ORDERED, that Novell's Motion for Entry of Judgment Based Upon Report of Special Master is hereby GRANTED, the award set forth therein is approved with joint and several liability in defendants NTC and Bondiett, except that plaintiff's requested further enhancements and modifications are DENIED; it is

FURTHER ORDERED, that except as set forth in this Order the findings of fact contained in the Report of the Special Master are accepted, the conclusions of law contained in the Report are adopted and the monetary award contained therein is approved and confirmed.

Counsel for plaintiff is directed to prepare and lodge with the court within 20 days after receipt of this Order a form of judgment consistent with this Order, after first complying with local Rule 206(b).