**FIRST SAVINGS BANK, F.S.B., Plaintiff,**

v.

**U.S. BANCORP and U.S. Bank National Association, Defendants.**

No. 95–4020–SAC.

United States District Court, D. Kansas.

Sept. 13, 2000.

Elizabeth R. Herbert, Pedro L. Irigonegaray, Robert V. Eye, Irigonegaray & Associates, Topeka, KS, Thomas H. Van Hoozer, Robert D. Hovey, John M. Collins, Hovey, Williams, Timmons & Collins, Kansas City, MO, for Plaintiff.

Arthur E. Palmer, Goodell, Stratton, Edmonds & Palmer, Topeka, KS, for Defendants.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

This case is before the court on several motions: Defendants' Motion in Limine (Dk. 340 ); Plaintiff's Motion to Strike Defendants' Motion in Limine No. (3) (Dk. 350 ); and Plaintiff's Motion in Limine (Dk. 342). The court informed the parties of its anticipated rulings by letter sent by facsimile on September 8, 2000. This order constitutes the court's rulings on these motions and the rationale for them.

## GOVERNING STANDARDS

The motion in limine is a creature of neither the Federal Rules of Civil Procedure nor the Federal Rules of Evidence.

*Deghand v. Wal–Mart Stores,* Inc., 980 F.Supp. 1176, 1179 (D.Kan.1997). Such motions do "aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial.'" *Palmieri v. Defaria,* 88 F.3d 136, 141 (2nd Cir.1996) (quoting *Banque Hypothecaire Du Canton De Geneve v. Union Mines, Inc.,* 652 F.Supp. 1400, 1401 (D.Md.1987)). They also may save the parties time, effort and cost in preparing and presenting their cases. *Pivot Point Intern., Inc. v. Charlene Products, Inc.,* 932 F.Supp. 220, 222 (N.D.Ill.1996). At the same time, it is the better practice to wait until trial to rule on objections when admissibility substantially depends upon what facts may be developed there. *See Sperberg v. Goodyear Tire & Rubber Co.,* 519 F.2d 708, 712 (6th Cir.), *cert. denied,* 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 303 (1975); *Hunter v. Blair,* 120 F.R.D. 667 (S.D.Ohio 1987).

■ The movant has the burden of demonstrating that the evidence is inadmissible on any relevant ground. *Plair v. E.J. Brach & Sons, Inc.,* 864 F.Supp. 67, 69 (N.D.Ill.1994). The court may deny a motion in limine when it "lacks the necessary specificity with respect to the evidence to be excluded." *National Union v. L.E. Myers Co. Group,* 937 F.Supp. 276, 287 (S.D.N.Y.1996). At trial, the court may alter its limine ruling based on developments at trial or on its sound judicial discretion. *Luce v. United States,* 469 U.S. 38, 41, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984). "Denial of a motion in limine does not necessarily mean that all evidence contemplated by the motion will be admitted at trial." *Hawthorne Partners v. AT & T Technologies, Inc.,* 831 F.Supp. 1398, 1401 (N.D.Ill.1993). Denial only means that the court cannot decide admissibility outside the context of trial. *Plair v. E.J. Brach &*

*Sons, Inc.,* 864 F.Supp. at 69. A ruling in limine does not "relieve a party from the responsibility of making objections, raising motions to strike or making formal offers of proof during the course of trial." *Thweatt v. Ontko,* 814 F.2d 1466, 1470 (10th Cir.1987) (internal quotation omitted).

## DEFENDANTS' MOTION IN LIMINE (Dk.340)

The court will begin with the defendant's motion as it was docketed first. Their memorandum (Dk.341) makes clear that the defendants are actually raising five separate motions for the court's resolution prior to trial. The court addresses them *seriatim.*

### I. *MOTION TO EXCLUDE EXPERT DAVID MILLER'S TESTIMONY*

■ Defendants first contend that the testimony of David Miller, plaintiff's expert regarding lost profits, is inadmissible under *Daubert v. Merrell Dow Pharmaceuticals,* 509 U.S. 579, 591, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), because it is neither relevant nor reliable. The court notes that the parties have agreed to address the issues regarding the admissibility of expert testimony by filing motions in limine, and that no *Daubert* hearing has been or will be held. This court has discretion to determine how to perform its gatekeeping function under *Daubert, Goebel v. Denver and Rio Grande Western R.R. Co.,* 215 F.3d 1083 (10th Cir.2000), and has before it sufficient evidence to perform "the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert,* 509 U.S. at 597, 113 S.Ct. 2786.

■ Under Fed.R.Evid. 702, [1] the trial court must act as a gatekeeper and deter-

1. Fed.R.Evid. 702 provides:
 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a

fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

mine at the outset, pursuant to Fed. R.Evid. 104(a), "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Daubert,* 509 U.S. at 592, 113 S.Ct. at 2796. "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.*

▆ "[W]hen the proffered expert relies on some principle or methodology," the trial court should consider a nonexhaustive list of nondispositive factors in determining whether the reasoning or methodology is scientifically valid or reliable: "(1) Can it and has it been tested?; (2) Has it been subjected to peer review and publication?; (3) Does it have a known or potential rate of error?; and (4) Has it attained general acceptance in the relevant scientific community?" *Compton v. Subaru of America, Inc.,* 82 F.3d 1513, 1518 (10th Cir.), *cert. denied,* 519 U.S. 1042, 117 S.Ct. 611, 136 L.Ed.2d 536 (1996). After *Daubert,* the court has continued to apply a traditional rule 702 analysis "except in cases involving unique, untested, or controversial methodologies or techniques." *Id.* at 1519. Application of the four factors set out in *Daubert* "is unwarranted in cases where expert testimony is based solely on experience or training." *Id.* at 1518.

▆ As part of the pretrial evaluation, the trial court also must determine whether the expert opinion is "based on facts that enable the expert to express a reasonably accurate conclusion as opposed to conjecture or speculation [but] absolute certainty is not required." *Kieffer v. Weston Land, Inc.,* 90 F.3d 1496, 1499 (10th Cir.1996) (quoting *Jones v. Otis Elevator Co.,* 861 F.2d 655, 662 (11th Cir.1988)). "[T]he 'touchstone' of admissibility is helpfulness to the trier of fact." *Werth v. Makita Elec. Works, Ltd.,* 950 F.2d 643, 648 (10th Cir.1991).

▆ Plaintiff has offered the testimony of David Miller as a damages expert regarding lost profits, yet plaintiff has not shown the court that the most basic prerequisites for admission of such testimony have been met. Although Miller anticipates testifying as an expert, he did not sign the report (Dk.341, Exh. A) upon which his opinion is based, (Dk.341, Exh. B, p. 6), is not a partner with the firm for which he is employed and does not know when or if he will become one (*Id.*), is not a C.P.A. (*Id.* at p. 138), has not provided his resume for the court's review, has never before been asked to value harm caused by use of a trade name or trademark (*Id.* at p. 144), has never testified either by deposition or in trial (*Id.* at p. 156), has never published any books or articles on valuation (*Id.* at p. 156–157), and does not believe he has ever done a financial analysis of any institution in Kansas before (*Id.* at p. 158).

▆ "A trial judge has broad discretion in determining the competency of an expert witness." *Kloepfer v. Honda Motor Co.,* 898 F.2d 1452, 1458 (10th Cir.1990). In making this determination, two general conditions must be met.

[F]irst, the subject matter must be closely related to a particular profession, business or science and not within the common knowledge of the average layman; second, the witness must have such skill, experience or knowledge in that particular field as to make it appear that his opinion would rest on substantial foundation and would tend to aid the trier of fact in his search for truth.

▆ *Graham by Graham v. Wyeth Laboratories,* 906 F.2d 1399, 1407–08 (10th Cir.) (*quoting Bridger v. Union Ry. Co.,* 355 F.2d 382, 387 (6th Cir.1966)), *cert. denied,* 498 U.S. 981, 111 S.Ct. 511, 112 L.Ed.2d 523 (1990). In the present case, Miller lacks the requisite skill, experience and knowledge in the field of determining causation of lost profits to financial institutions as to make his opinion rest on a substantial foundation and aid the trier of fact in his search for truth. The court is

well aware that a witness's lack of specialization does not affect the admissibility of the opinion, but only its weight, *see Wheeler v. John Deere Co.*, 935 F.2d 1090, 1100 (10th Cir.1991), but Miller's lack of qualifications noted above go far beyond mere lack of specialization. Although the court has grave doubts as to Miller's qualifications, its opinion regarding admissibility of his testimony does not rest on this ground alone.

■■ Instead, the court has examined the substance of the proffered testimony. Although the defendant has asserted other grounds for exclusion of Miller's testimony, the court finds two to be controlling: that Miller based his opinion on an assumption of the very fact that his report is intended to prove, and that he improperly attributed all of plaintiff's losses to the defendants' allegedly illegal acts, despite the presence of significant other factors.

When asked in his deposition whether his "entire analysis is based upon the assumption that the Defendant's name change caused a deposit loss for the Plaintiff," Miller replied; "That's correct." (Dk. 341, Exh. B at 61). When asked "If your numbers are to have any validity, your assumption that the entire decline in market share is attributable to the Defendants must be true," Miller replied: "That's correct." (*Id.*, at p. 89). At no time throughout his deposition did Miller retract or qualify those answers.

The expert report which Miller helped prepare, but did not sign, states: "Our engagement involved estimating the financial loss to First Bank as a result of the confusion created when FBS entered First Bank's market through acquisition, changed the name of the acquired financial institution and began marketing itself to the public in a manner equivalent to First Bank." (Dk. 341, Exh A). That report additionally states: "Conceptually, the damages incurred by First Bank directly relate to the loss in business (i.e., the reduced ability to gather deposits and originate loans) First Bank experienced beginning February 18, 1997, the time when FBS began to render banking services under the name First Bank." (*Id.*) Miller based the report on the assumption that plaintiff's loss in business was caused by confusion created in the marketplace by defendants. Plaintiff cannot introduce Miller's testimony or report to prove that the fact assumed by Miller is true.

Crucial to the court's determination is the fact that Miller improperly attributed all losses to the defendants' allegedly illegal acts, despite the presence of other factors that could be significant to his analysis. The fact that Miller's estimates are based—without any evidentiary or even statistical support—on an assumption that defendants caused all declines suffered by plaintiff also infects his basic methodology. Miller admitted that it was an important part of his analysis to assure himself that there were not other factors that were responsible for declines in deposit levels at plaintiff's institution. (Dk.341, Exh. B, p. 14). But Miller admitted that the only such factor he considered was whether plaintiff's interest rates were comparable to those of other institutions in its marketplace. (*Id.*, at p. 13–14).

Among the factors Miller did not account for are the following: (1) that plaintiff was under a publicized Cease and Desist Order from 1991 to 1995, which was replaced by other restrictions that lasted until the end of 1997 [2] (Dk.341, Exh. B, p. 91–92, 94); (2) that plaintiff had received from a reputable evaluator of financial institutions for a number of years before the alleged infringement began, a publicized rating of zero (the worst rating possible for a non-liquidated institution) (Dk.341, Exh. F, p. 35); (3) that plaintiff lost a contract with Kansas State University in

---

**2.** Although the exact dates of the Order are not included in the exhibits submitted in support of this motion, plaintiff does not contest these dates, as represented by defendants' counsel in its memorandum, or other assertions of factors that Miller failed to account for.

June of 1997 and subsequently filed an unsuccessful lawsuit against KSU, which plaintiff's officers believed could cost plaintiff $15 to $20 million dollars in deposits (Dk. 341, Exh. E at p. 129–30; Exh. F at p. 32–33); (4) that throughout the 90's, plaintiff liquidated millions of dollars of defaulted real estate loans it had made to hotels and other businesses (Dk. 341, Exh. F at 37–38); (5) that plaintiff closed its sole branch in Marysville, resulting in a negative impact on its deposit base (Dk. 341, Exh. E at p. 133–134); and (6) that plaintiff had a history of deposit losses before February of 1995 when defendants bought branch banks in Kansas (Dk.341, Exh. B, p. 57). Further, Miller conducted no analysis of how deposit growth for savings and loans or savings banks differed from deposit growth for financial institutions as a whole. (Dk. 341, Exh. B at p. 102–103).

Miller's failure to account for some or all of these factors is not immaterial. Plaintiff's officers have testified that some of the factors or events noted above had a "negative impact" upon the plaintiff, its image, or its deposit base. (*See e.g.,* Dk. 341, Exh. E, at p. 119, 129–130, 133–134: Exh. F at p. 32–33, 35, 37–38). Under these circumstances, Miller's failure to consider any factor affecting deposit levels other than interest rates makes his testimony inherently unreliable and purely speculative.

Plaintiff has not attempted to show the court that Miller's reasoning or methodology in ignoring all factors but interest rates has been tested, has been subjected to peer review and publication, has a known or potential rate of error, or has attained general acceptance in the relevant scientific community. Instead, plaintiff merely argues that the evidence goes to the weight of Miller's proposed testimony, and not to its admissibility.

The court disagrees and concludes that Miller's testimony and his report are inadmissible under Fed.R.Evid. 702 because they would not assist the jury in determining the amount of actual damages defendants caused plaintiff to suffer. *See Schiller & Schmidt, Inc. v. Nordisco Corp.,* 969 F.2d 410, 415–16 (7th Cir.1992) (expert should have separated injury due to unlawful conduct from that due to new entry in market); *Herman Schwabe, Inc. v. United Shoe Machinery Corp.,* 297 F.2d 906, 911 (2d Cir.) (economist's damage evidence properly excluded where no basis for assumption established), *cert. denied,* 369 U.S. 865, 82 S.Ct. 1031, 8 L.Ed.2d 85 (1962); *Cochrane v. Schneider Nat. Carriers, Inc.,* 980 F.Supp. 374 (D.Kan.1997) (excluding expert estimates of loss based on unjustified assumptions); *In re Aluminum Phosphide Antitrust Litigation,* 893 F.Supp. 1497, 1507 (D.Kan.1995) (proposed expert opinions based on unjustified assumptions would not assist the trier of fact and were therefore inadmissible under rule 702) (and cases cited therein); *Southern Pacific Communications Co. v. American Tel. & Tel. Co.,* 556 F.Supp. 825, 1075–76 (D.D.C.1982) (damage model based on unreasonable and speculative assumptions not sufficient to support just and reasonable approximation of damages).

The admonition noted by the Seventh Circuit in *Schiller & Schmidt, Inc. v. Nordisco Corp.,* 969 F.2d at 416, is equally applicable here:

> ... people who want damages have to prove them, using methodologies that need not be intellectually sophisticated but must not insult the intelligence. (citations omitted) Post hoc ergo propter hoc will not do; nor the enduing of simplistic extrapolation and childish arithmetic with the appearance of authority by hiring a professor to mouth damages theories that make a joke of the concept of expert knowledge.

Moreover, the court concludes that the testimony should also be excluded on this basis under rule 403 because its minimal probative value would be substantially outweighed by the unfair prejudice and the confusion to the jury that would result from the authoritative rendering of such

substantial damage estimates by a purported economic expert.

## II. *MOTION TO EXCLUDE EXPERT KURT ESKILSON'S TESTIMONY*

Defendants next contend that the testimony of Kurt Eskilson, plaintiff's expert regarding costs of conducting a corrective advertising campaign, is inadmissible under *Daubert* and *Kumho,* because it is neither relevant nor reliable.

The report provided by Eskilson lists media expenditures totaling $122,118.49, and production expenditures totaling $64,034.00. No narrative is included, but the purpose of the report, and Eskilson's proposed testimony, is apparently to establish that plaintiff has been or will be damaged in those amounts.

Eskilson's report (Dk.341, Exh. C) is unsigned. No resume, curriculum vitae, or other indicia of his qualifications have been provided to this court. His deposition (Dk.341, Exh. D) fails to establish where he works, what his job title or duties are, or his educational or work history. It does, however, establish that Eskilson has never given a deposition before (Dk. 341, Exh. D, at p. 4), and none of his work has been published. (*Id.,* at p. 12). When asked whether he had ever had any involvement in any similar ad campaign, Eskilson admitted that he did not feel as though he knew enough about the specifics of the situation that he could answer the question. (*Id.* at p. 41). Although Eskilson's testimony appears to be based upon his experience or training, as opposed to any particular methodology or technique, the court has no clue what his experience or training is. Based upon the law set forth in Section I above, no basis for permitting Eskilson to testify as an expert has been shown.

Additionally, the substance of Eskilson's testimony is not sufficiently reliable to warrant its admission. Eskilson testified that he has never heard anything about any specific harm to plaintiff, and that before he would implement an advertising campaign, he would have to know that information. (Dk.341, Exh. D, p. 18–19). Eskilson did not review Miller's proposed figures regarding lost profits, or any other documents demonstrating either the nature or extent of harm suffered by plaintiff because of any name confusion. He was unaware of the words and logo the defendants used to market its banking services in Kansas, and had no understanding of how those words or logo differed from those used by plaintiff. (*Id.,* at p. 22–23).

Eskilson's figures are an "example" to establish what it might cost to do a campaign that could rehabilitate plaintiff's name. (*Id.,* at p. 26). He assumed the following facts: that for three years there had been two financial institutions in the same marketplace with the same name and that confusion had resulted. (*Id.,* at p. 19). Eskilson did not go so far as to determine what the concept or message would be in the advertising campaign, (*Id.,* at p. 16–17), but admits that the message can have an effect on the costs. (*Id.* at 42).

Because Eskilson's testimony fails to take into account the specific facts of the case, it is too speculative to assist the jury in determining the amount plaintiff would be damaged by engaging in a remedial advertising campaign. Based upon the law stated in Section I, the court concludes that Eskilson's testimony and report are inadmissible under rules 702 and 403.

## III. *EVIDENCE AND ARGUMENTS IN SUPPORT OF RECOVERING DEFENDANTS' PROFITS, DEFENDANTS' AVOIDED COSTS, AND PUNITIVE DAMAGES*

From the premise that the recovery of these damages requires proof of bad faith infringement, the defendants seek to exclude all evidence of these damages. The defendants contend the plaintiff is unable to prove the defendants acted in bad faith in adopting and using its allegedly infringing trade names and marks. As proof of their good faith actions, the defendants point to the following: (1) their possession of federal trademark registrations; (2)

their prior use of trademarks in Kansas; (3) their adoption of a name with the additional geographic modifier, "Kansas," in an effort to minimize confusion; (4) the parties' stipulation to the defendants' limited use of their mark pending final judgment of the district court; (5) the defendants' reliance on this court's prior summary judgment order; and (6) the defendants' successful litigation in other forums involving related claims. The defendants further argue that "avoided costs" is not a proper measure of damages. As for their profits, the defendants rely on the plaintiff's method of calculating its lost profits and argue their deposit base in the area banks declined markedly after the name change. Finally, the defendants argue no rational person could find that they adopted First Bank Kansas in order to benefit from the plaintiff's reputation or good will.

## A) *General Law on Trademark Infringement Damages*

 "Monetary recovery for a violation of trademark rights is governed by 15 U.S.C. § 1117." *Bishop v. Equinox Intern. Corp.*, 154 F.3d 1220, 1222 (10th Cir.1998). By design and application, this statute makes Lanham Act violations unprofitable without furthering a punitive purpose. *United Phosphorus Ltd. v. Midland Fumigant, Inc.*, 21 F.Supp.2d 1247, 1251 (D.Kan.1998), *aff'd*, 205 F.3d 1219 (10th Cir.2000); *see* 15 U.S.C. § 1117(a) ("Such sum ... shall constitute compensation and not a penalty."). "Trademark remedies are guided by tort law principles," including the general rule that damages "must be established with reasonable certainty." *Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1407 (9th Cir.) (citations omitted), *cert. denied*, 510 U.S. 815, 114 S.Ct. 64, 126 L.Ed.2d 34 (1993). The burden is with the plaintiff to prove the fact and the extent of damages. *Id.* "[C]ourts have denied a monetary award in infringement cases when damages are remote and speculative." *Id.* at 1408 (citations omitted).

 Typically, damages are "measured by any direct injury which a plaintiff can prove, as well as any lost profits which the plaintiff would have earned but for the infringement." *Lindy Pen Co., Inc.*, 982 F.2d at 1407. In short, the "plaintiff must prove it has been damaged by actual consumer confusion or deception resulting from the violation." *Brunswick Corp. v. Spinit Reel Co.* 832 F.2d 513, 525 (10th Cir.1987). To prove confusion, the plaintiff may use direct evidence of confusion, sales diversions or the public's testimony, or circumstantial evidence such as consumer surveys. *Id.* It is not unusual for proof of actual damages to be difficult. *Lindy Pen Co., Inc.*, 982 F.2d at 1407. "'Trademark infringement is a continuous wrong and, as such, gives rise to a claim for relief so long as the infringement persists.'" *Brunswick Corp.*, 832 F.2d at 526 (quoting *James Burrough Ltd. v. Sign of the Beefeater, Inc.*, 572 F.2d 574, 578 (7th Cir. 1978)).

 Actual compensatory damages may include the cost of advertising to correct the consumer confusion resulting from the defendant's infringement, especially if false advertising was what the defendant used. *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1374 (10th Cir.1977), *cert. dismissed*, 434 U.S. 1052, 98 S.Ct. 905, 54 L.Ed.2d 805 (1978); *Novell, Inc. v. Network Trade Center, Inc.*, 25 F.Supp.2d 1233, 1244 (D.Utah 1998). "[I]f plaintiff can show that it cannot afford to pay for the advertising that would be necessary to correct defendant's alleged infringement, then it can recover an appropriate amount for future corrective advertising." *Universal Motor Oils Co., Inc. v. Amoco Oil Co.*, 809 F.Supp. 816, 822 (D.Kan.1992) (*citing Big O Tire Dealers*, 561 F.2d at 1375). Such damages depend on what the defendant expended for infringing advertising and are "proportioned according to the geographic area where plaintiff and defendant both operate, then divided in one-fourth to corre-

spond to the FTC's regulations for corrective advertising." *Id.*

■■■■■ An accounting of the defendant's profits from the infringing conduct is another remedy available under § 1117(a). The recovery of the defendant's profits does not depend upon the plaintiff first recovering its actual damages. *Bishop,* 154 F.3d at 1222.[3] Instead, a plaintiff generally may not recover its own lost profits, as well as the defendant's profits, in a trademark infringement action. *United Phosphorus,* 21 F.Supp.2d at 1251. A plaintiff may not recover the defendant's profits without showing the "defendant's actions were willful or in bad faith." *Bishop,* 154 F.3d at 1223. "The plaintiff has only the burden of establishing the defendant's gross profits from the infringing activity with reasonable certainty. Once the plaintiff demonstrates gross profits, they are presumed to be the result of the infringing activity." *Lindy Pen Co., Inc.,* 982 F.2d at 1408 (citation omitted). It then becomes the defendant's burden "of showing which, if any, of its total sales are not attributable to the infringing activity, and additionally, any permissible deductions for overhead." *Id.* at 1408.

■■■■ Punitive damages are recoverable under Kansas law when the defendant's infringement was willful. *Universal Motor Oils,* 809 F.Supp. at 822. A plaintiff in Kansas must first recover actual damages to be eligible for punitive damages. *Id.* at 823.

B) *Proof of Bad Faith or Willful Infringement*

■■■■ In trademark infringement cases, courts have defined "willfulness" to be "conduct showing a 'deliberate and intentional design to cause confusion and mistake to deceive purchasers.'" *Novell, Inc.,* 25 F.Supp.2d at 1243 (quoting *National Lead Co. v. Wolfe,* 223 F.2d 195, 205

(9th Cir.), *cert. denied,* 350 U.S. 883, 76 S.Ct. 135, 100 L.Ed. 778 (1955)). "It involves an intent to infringe or a deliberate disregard of a mark holder's rights." *SecuraComm Consulting Inc. v. Securacom,* 166 F.3d 182, 187 (3rd Cir.1999). Bad faith is the continuing use of a mark knowing that it is wrongful. *Takecare Corp. v. Takecare of Oklahoma, Inc.,* 889 F.2d 955, 957 (10th Cir.1989). There is no bad faith or willful infringement "if the defendant might have reasonably thought that its proposed usage was not barred by the statute." *SecuraComm Consulting Inc. v. Securacom,* 166 F.3d at 188; *Blockbuster Videos, Inc. v. City of Tempe,* 141 F.3d 1295, 1300 (9th Cir.1998). On the other hand, when a defendant continues to use a mark without reasonably investigating a plaintiff's claimed rights to the mark, then the defendant may lack a good faith belief in the lawfulness of its continued use. *International Star Class Yacht Racing Ass'n v. Tommy Hilfiger, U.S.A., Inc.,* 80 F.3d 749, 754 (2nd Cir.1996).

■■■ The defendants contend the plaintiff cannot prove willful or bad faith infringement unless it presents evidence of the defendants' palming off their services as the plaintiff's bank. Such an approach would essentially preclude a finding of willfulness in every case of reverse confusion, like this one. *See Trovan, Ltd. v. Pfizer, Inc.,* 2000 WL 709149, at *24 (C.D.Cal. 2000). On the other hand, bad faith infringement cannot be inferred from the fact that a large company merely adopts a trademark knowing of its prior use by a smaller company. *Id.*

On the briefs, the defendants submit several compelling arguments for why a rational jury could not find the defendants to have acted willfully or in bad faith in adopting and using the allegedly infringing marks in this five-country trade territory.

---

**3.** Actual "damages directly measure the plaintiff's loss, *defendant's* profits measure the defendant's gain. Thus, an accounting may overcompensate for a plaintiff's actual injury and create a windfall judgment at the defendant's expense." *George Basch Co., Inc. v. Blue Coral, Inc.,* 968 F.2d 1532, 1540 (2nd Cir.) (citation omitted), *cert. denied,* 506 U.S. 991, 113 S.Ct. 510, 121 L.Ed.2d 445 (1992).

As with several issues that were raised and discussed in the summary judgment proceedings, this in limine issue depends in significant part on what evidence the plaintiff eventually offers to prove likelihood of confusion, specifically, its evidence regarding the incidence, extent and kind of actual confusion. This evidence of actual confusion, as well as the evidence of the defendants' knowledge of it during the relevant time periods, are important in deciding the reasonableness of the defendants' belief that its use of the mark was not contrary to the law. The arguments and evidence of record do not rule out that the plaintiff may be able to prove the defendants deliberately disregarded significant and frequent incidences of actual confusion after the name change and continued to use these marks to avoid increased expenses despite the admitted significant litigation risk. For these reasons, the court does not believe the defendants have ruled out every relevant ground for this evidence.

The defendants alternatively argue the plaintiff may not recover the annual costs of $600,000 per branch bank that the defendants avoided in adopting and using the allegedly infringing service mark. The plaintiffs argue these damages are recoverable not only as part of a willful infringement but also as part of actual damages. Logically, whatever costs a defendant avoids by violating a trademark would be necessarily included in the defendant's profits resulting from the violation, that is assuming the defendant turns a profit sufficient to reflect any avoided expenses. Thus, the plaintiff may be entitled to recover either lost profits and some additional amount for avoided costs or just avoided costs when the defendant would have had less profits or greater losses without the avoided costs. Because it remains true that avoided costs typically are a component of an accounting of the defendant's profits, this kind of damages is available under the same rationales and is subject to the same bad faith or willful infringement threshold established in Tenth Circuit case law. The court notes that the full recovery of both avoided costs and lost profits could result in a duplicative recovery.

## IV. PLAINTIFF'S CLAIMED MARK AT TRIAL MUST BE THE SAME MARK CONSIDERED AND USED BY THE TENTH CIRCUIT IN THE PRIOR APPEAL

In the Tenth Circuit's decision, the court identified the walking-one logo with FIRSTBANK as "the most prominent mark used by First Savings." 101 F.3d 645 at 648. In analyzing the similarity of the marks, the Tenth Circuit described the plaintiff's mark as follows: "The words are pushed together and are accompanied by the distinctive walking-one logo." 101 F.3d at 653. The Tenth Circuit held that the visual differences between the marks were "apparent." *Id.* "As to pronunciation," the defendant's mark contained an extra word. As to meaning, the plaintiff's mark with its logo "conveys a different and more focused impression." *Id.* In responding to the defendants' argument that the dominant portion of its 1971 registration was FIRST BANK which is similar in appearance and identical to the plaintiff's mark, the Tenth Circuit held that "each mark still must be considered as a whole" and "that when the entire marks and attending logos were compared, the differences outweighed the similarities." 101 F.3d at 653. The Tenth Circuit further described FIRST BANK per se, "the common feature of the two marks," as "weakly protected" such that "minor alterations," like the above dissimilarities, "weigh heavily against any likelihood of confusion." 101 F.3d at 655.

The defendants contend that "[a]s a matter of law of the case, the plaintiff's mark at issue must be the mark it persuaded the Tenth Circuit should be compared to defendants' prior registration: its FIRSTBANK-plus-walking-one-logo. No change in claimed marks—one mark for the court of appeals, a different one for the jury—should be permitted." (Dk.341, p. 24). Relying on the law of the case doc-

trine and logic, the defendants maintain the plaintiff must be unable to "obtain a reversal of this Court's summary judgment decision by persuading the Tenth Circuit that its mark is FIRSTBANK-plus-walking-one-logo and then obtain a jury verdict of confusing similarity by persuading the jury that its mark is really just FIRST-BANK." (Dk.341, p. 24). The defendants call attention to footnote eight in the Tenth Circuit's decision where it was emphasized that a party cannot assert rights in one mark but assert likelihood of confusion in a different mark:

> In *Homeowners Group, Inc. v. Home Marketing Specialists, Inc.,* 931 F.2d 1100, 1106 (6th Cir.1991), the court carefully explained how confusion regarding the precise marks to be compared can lead to error. There, the district court had assumed as a matter of logic that ownership in a mark consisting of the initials HMS alone also granted to the plaintiff ownership in a mark consisting of the same initials with a roof design. The court of appeals stated:
>
> > Homeowners argues that since it has ownership of a mark consisting of the initials HMS, such ownership extends to other marks containing those initials along with other words or designs. This is the argument accepted by the District Court without proper analysis. Homeowners cannot make out an infringement case against [Defendant] by showing ownership of one mark (the initials HMS alone) and a likelihood of confusion based on a comparison between a different mark (the HMS-roof design mark) and [Defendant's] mark.
>
> *Id.* Similarly, here, First Bank System cannot make out its constructive notice defense by showing registration of the 1971 mark, but then a likelihood of confusion between a different mark (FIRST BANK or FIRST BANK SYSTEM per se) and First Savings' mark.

101 F.3d at 652 n. 8.

In its filed written response, as well as its letter dated September 10, 2000, and sent by facsimile to chambers, the plaintiff strenuously opposes this motion. First, the plaintiff insists that throughout the pleadings in this case it has claimed rights in FIRSTBANK *per se,* as well as rights in FIRSTBANK with the logo. Second, the plaintiff denies trying to persuade the Tenth Circuit that it has asserted rights only in FIRSTBANK with the walking-one logo. Third, the plaintiff insists this issue was never raised to the Tenth Circuit or decided by it. Fourth, the plaintiff argues that this issue was first raised *sua sponte* in the court's recent summary judgment order [4] and that it would be a denial of due process to bar evidence and argument regarding any rights in FIRSTBANK *per se.* To grant this motion, in the plaintiff's words, would amount to "rewriting plaintiff's complaint and the pretrial order, over plaintiff's objection and on the very eve of trial." (Plaintiff's letter of September 10, 2000, ¶ 5). Fifth, the plaintiff maintains the Tenth Circuit's decision "is not predicated on the presence" of its logo. (Dk.352, p. 10). The plaintiff points to the Tenth Circuit's analysis of similarity in pronunciation and to the court's general comment in footnote 12 about a party possibly gaining secondary meaning in FIRST BANK.

In the recent summary judgment order, the district court noted that the Tenth Circuit had said the plaintiff's FIRST-BANK with the walking-one logo "is the most prominent mark used by First Savings." 101 F.3d at 648. (Dk.335, p. 17). The district court also observed that the summary judgment record sustained the Tenth Circuit's conclusion. For this reason, the district court found for purposes of summary judgment "that what the

---

4. The court takes exception with this argument. As reflected in the record, the defendants' motion for summary judgment raised this issue and the plaintiff's brief in opposition responded to it. This issue is not new to this case, nor was it first raised by the court.

Tenth Circuit identified as the plaintiff's mark is also the whole mark that was most prominently used by the plaintiff and most frequently encountered by consumers in the marketplace." *Id.* At summary judgment, the court did not discuss the law of the case doctrine, nor did the defendants specifically argue for its application.

 In its most common terms, the law of the case functions as a doctrine that " 'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.' This rule of practice promotes the finality and efficiency of the judicial process by 'protecting against the agitation of settled issues.' " *Christianson v. Colt Industries Operating Corp.*, 486 U.S. 800, 816, 108 S.Ct. 2166, 100 L.Ed.2d 811 (1988) (quoting *Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983) and 1B J. Moore, J. Lucas, & T. Currier, *Moore's Federal Practice* ¶ 0.404[1], p. 118 (1984)). "The doctrine of law of the case comes into play only with respect to issues previously determined." *Quern v. Jordan*, 440 U.S. 332, 347 n. 18, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979) (citation omitted).

 The court now is principally concerned with this doctrine's operation following an appellate court decision. "The 'law of the case' doctrine requires every court to follow the decisions of courts that are higher in the judicial hierarchy." *Guidry v. Sheet Metal Workers Local No. 9*, 10 F.3d 700, 705 (10th Cir. 1993), *modified on other grounds*, 39 F.3d 1078 (10th Cir.1994), *cert. denied*, 514 U.S. 1063, 115 S.Ct. 1691, 131 L.Ed.2d 556 (1995). In other words, when an appellate court issues a decision and remands the case, then the district court must be obedient in carrying out the higher court's mandate. 18 *Moore's Federal Practice* § 134.23[1][a] (3d ed.1999). This "nondiscretionary aspect of the law of the case doctrine is sometimes called the 'mandate rule.' " *Id.* (citing in part *United States on Behalf of Dept. of Labor v. Insurance Co. of North America*, 131 F.3d 1037, 1041

(D.C.Cir.1997)). This rule covers those issues that are decided explicitly or are resolved implicitly. *Rishell v. Jane Phillips Episcopal Memorial Medical Center*, 94 F.3d 1407, 1410 (10th Cir.1996), *cert. dismissed*, 520 U.S. 1152, 117 S.Ct. 1331, 137 L.Ed.2d 491 (1997); *Guidry*, 10 F.3d at 705. In sum, "[l]aw of the case principles do 'not bar a district court from acting unless an appellate decision has issued on the merits of the claim sought to be precluded.' " *Wilmer v. Board of County Commissioners of Leavenworth County*, 69 F.3d 406, 409 (10th Cir.1995) (quoting *United States v. Caterino*, 29 F.3d 1390, 1395 (9th Cir.1994), *overruled on other grounds, Witte v. United States*, 515 U.S. 389, 115 S.Ct. 2199, 132 L.Ed.2d 351 (1995)). Put another way, "when further proceedings follow a general remand, the lower court is free to decide anything not foreclosed by the mandate issued by the higher court." *Guidry*, 10 F.3d at 706 (quotations omitted).

 The Tenth Circuit has identified three circumstances by which a court may determine that an issue has been implicitly decided in a prior appeal for purposes of the law of the case doctrine:

(1) resolution of the issue was a necessary step in resolving the earlier appeal; (2) resolution of the issue would abrogate the prior decision and so must have been considered in the prior appeal; (3) the issue is so closely related to the earlier appeal its resolution involves no additional consideration and so might have been resolved but unstated.

*Guidry*, 10 F.3d at 707; *see also Rishell*, 94 F.3d at 1410. As discussed below, the court believes these circumstances show the Tenth Circuit implicitly decided the service mark in which the plaintiff is able to assert legal ownership.

Under the heading of "First Savings' 'FirstBank' Mark," the Tenth Circuit held that the plaintiff's "mark consists of 'First-Bank' next to a number one that appears in motion (the 'walking one')." 101 F.3d at 647. Two paragraphs later in its opinion,

the Tenth Circuit described the plaintiff's claim and mark in these terms:

> As a result, from 1983 to the present, First Savings has used the Firstbank mark without interruption in connection with its banking services, and now claims exclusive rights to the mark within a five-county trade territory. On bank signs, advertisements, documents, et., the mark appears as follows:
>
> This is the most prominent mark used by First Savings. However, First Savings does not have a federal registration for the mark, and apparently has never attempted to obtain one.

101 F.3d at 648. In unambiguous terms, the Tenth Circuit defined the plaintiff's mark as FIRSTBANK including the logo, and all other references in that opinion to First Savings' mark or to FIRSTBANK necessarily includes the logo as part of the mark. The Tenth Circuit never mentions nor considers the plaintiff's mark to be FIRSTBANK *per se.*

■ "A federally registered mark is superior to any confusingly similar mark subsequently adopted anywhere in the United States." *First Savings Bank,* 101 F.3d at 651. In applying this rule, the Tenth Circuit first needed to decide what mark was the plaintiff's before determining whether it was confusingly similar to the 1971 federal registration. As already outlined and quoted above, the Tenth Circuit repeatedly referred to the logo as part of the plaintiff's mark in the analysis of similarity. In analyzing strength, the court referred back to the same dissimilarities. At footnote twelve, the court noted that "designs and logs may add distinction to" FIRST BANK, thus increasing its strength from an otherwise "weakly descriptive" term. 101 F.3d at 655. Finally, the Tenth Circuit held that "in light of the record and the proper legal standards, that further consideration of this [constructive notice] defense on remand would be a pointless exercise." 101 F.3d at 656. The panel also wrote that "the 1971 registration cannot serve as a defense in this case." 101 F.3d at 647. Thus, the Tenth Circuit considered its analysis to encompass all issues and matters pertinent to this defense. Presumably, if the Tenth Circuit understood the plaintiff to be asserting rights in more than one mark, then the court would have either mentioned the other mark in its analysis or remanded the case for consideration of this defense against the other mark. This is particularly true here because the plaintiff's mark used by the Tenth Circuit is obviously stronger and more distinct than the mark of FIRSTBANK *per se.*

The plaintiff's exaggerated pleas of a denial of due process or an improper judicial rewriting of its claims ignore its own noteworthy role in this rather unique situation. Nothing prevented the plaintiff from seeking reconsideration or clarification from the Tenth Circuit with regards to its description of the plaintiff's service mark. The plain wording of the Tenth Circuit's decision presented the plaintiff with this obvious option. The importance of doing so also should have been apparent in that the plaintiff knew the Tenth Circuit had only considered the entire service mark with all of its added distinctions. In these circumstances, justice and fairness demands that the plaintiff's claims at trial be limited to the same service mark which won them the appeal on the constructive notice defense. Notwithstanding the plaintiff's allegations in its supplemental complaint or the pretrial order, the law of the case doctrine as well as basic fairness compel this result.

The court will not apply this ruling as to preclude the plaintiff from presenting evidence on the particular uses of its service mark in different contexts or aspects of its business or on the consuming public's understanding and use of it. The court understands such evidence may necessarily include uses without the logo. Thus, this ruling does not preclude the plaintiff from introducing evidence regarding its history of marks and names leading up to the 1983 adoption of the service mark or the different uses of the service mark with and without the logo. The ruling, however,

does bar the plaintiff from arguing rights in any service mark other than the one described by the Tenth Circuit. The jury instructions likewise will reflect the plaintiff has a claim in only this service mark.

## V. PLAINTIFF'S EVIDENCE OF USE AFTER MARCH 12, 1992.

The defendants filed on March 12, 1992, their successful application for a service mark consisting of an octagon logo followed by "First Banks." It was registered June 21, 1994. Because the plaintiff asserts that "Kansas" is a mere "fig leaf" in its mark of "First Bank Kansas," the defendant contends its 1994 federal registration is "the plural form of the precise mark the plaintiff now claims is infringing." (Dk.341, p. 29). Thus, if the plaintiff does not prove secondary meaning prior to March 12, 1992, the defendants say they prevail. The defendants seek an order limiting the plaintiff's evidence of use to that occurring prior to March 12, 1992.

The plaintiff asserts the prior user exclusion of 15 U.S.C. § 1057(c)(1), to the statutory constructive notice flowing from the 1992 filing. *Citing Lucent Information Management, Inc. v. Lucent Technologies, Inc.,* 186 F.3d 311, 315 (3rd Cir. 1999), *cert. denied,* 528 U.S. 1106, 120 S.Ct. 845, 145 L.Ed.2d 714 (2000), the plaintiff contends that it need only prove "use" prior to March 12, 1992, to qualify for this exclusion. The plaintiff further argues that the federal registration is limited in covering the defendants' use of "First Banks" only with its octagon logo in a credit card background. Thus, the plaintiff disputes that this registration is confusingly similar to its service mark.

The court denies the defendants' motion to exclude the plaintiff's evidence of use after March of 1992. To permit time for additional research on this issue, the court reserves for a subsequent order whether the plaintiff must prove secondary meaning as part of its "use" exclusion under 15 U.S.C. § 1057(c)(1). Furthermore, the court believes this evidence may also be relevant in the event that the jury finds that the 1992 registration is not confusing-

ly similar to the plaintiff's service. Consequently, the defendant is not entitled to an in limine order regarding this evidence.

## PLAINTIFF'S MOTION IN LIMINE

### I. ADVICE OF COUNSEL DEFENSE

In this motion, plaintiff seeks to preclude defendants from asserting the advice of counsel defense, given defendants' earlier representation in an unsupplemented interrogatory that they did not intend to assert such a defense. In response, (Dk.347), defendants reaffirm that they do not intend to assert at trial the defense of advice of counsel. Accordingly, plaintiff's motion regarding this issue is denied as moot

### II. DEFENDANTS' TRADEMARK REGISTRATIONS

The plaintiff next seeks to exclude all evidence relating to certain federal trademark registrations filed by defendants, as reflected in Exhibits D–1, D–2, D–3, and D–4. The plaintiff contends the 1971 registration is inadmissible as it has expired and cannot serve as any legal defense after the Tenth Circuit's decision. The plaintiff contends the 1989 registration and the 1990 registration are now expired as a matter of law. The plaintiff summarily argues these registrations are "irrelevant under 15 U.S.C. § 1072, relating to constructive notice," because the plaintiff is a prior user and because "constructive notice terminates with the registration on which it is based." As far as the 1994 registration with the 1992 application, the plaintiff maintains the defendants abandoned the trademark when they took the name of U.S. Bank. According to the plaintiffs, the 1994 registration is an "unenforceable 'dead letter.'" The plaintiff offers no authority for its apparent argument that once expired and/or abandoned a federal registration can never be said or held to have provided constructive notice while it was effective.

The plaintiff simply has not carried its burden in proving these federal registra-

tions are inadmissible as a matter of law. The defendants have articulated several relevant and potentially admissible grounds for introducing these registrations. The court denies this motion.

## III. USE OF MARKS OUTSIDE THE FIVE–COUNTY AREA

The plaintiff asks the court to exclude evidence of the defendants' use of marks outside the plaintiff's five-county trade territory specified in the Pretrial Order.[5] Asserting no claims outside those five counties, the plaintiff argues evidence of outside use is irrelevant, would unduly confuse the jury, and amounts to an improper defense of *jus tertii*.[6]

The plaintiff again has not carried its burden of proving that this evidence is inadmissible on any possible relevant ground or that the probative value of this evidence is outweighed by the danger of unfair prejudice, confusion of issues, or misleading the jury. The defendant has identified several possible areas where this evidence could be relevant, including the defendants' good faith effort to search Kansas for other banks using "First" and the background or baseline confusion in Kansas based on the number of banks using "First" and "Bank" in their marks or names. Such evidence also may be admissible in determining whether the consumers within the trade territory exclusively associate FIRSTBANK with the plaintiff. Finally, this evidence could be relevant in the defendant proving that the plaintiff's five-county trade territory was within the defendants' natural zone of expansion. The court is confident that the challenged evidence can be admitted for a proper purpose without constituting an improper defense of *jus tertii*. Accordingly, this motion is denied.

5. These are Douglas, Riley, Geary, Pottawatomie and Marshall.

6. This defense arises when a defendant seeks to assert the rights of a third party. See *Marshak v. Sheppard*, 666 F.Supp. 590, 599 (S.D.N.Y.1987) (trademark case), and *Visa International Service Ass'n v. Bankcard Holders*

## IV. EXHIBIT D–200 NOW NUMBERED D–206

Plaintiff has moved the court to exclude defendants' proposed trial exhibit D–200, now numbered D–206. This exhibit is a "Notice of Opposition" filed by a Salina bank, a non-party here, in an unrelated administrative proceeding, which sought to preclude defendants' federal registration of the mark FIRST BANK KANSAS. Plaintiff anticipates that the defendants will use this document to try to show prior use of FIRST BANK KANSAS in plaintiff's trade territory and/or adjacent areas.

Plaintiff asserts that this exhibit is inadmissible because it is a pleading which contains merely allegations and not evidence, and is hearsay. The court takes this motion under advisement, and will determine the admissibility of the exhibit in the event it is offered at trial.

## V. TESTIMONY OF THOMAS VAN HOOZER

Plaintiff seeks to preclude defendants from calling Mr. Thomas Van Hoozer as a witness at trial. Mr. Van Hoozer is currently an attorney for the plaintiff, but previously represented the Salina bank which filed the "Notice of Opposition" which is the subject of plaintiff's fourth motion in limine, addressed above. Defendants respond that Mr. Van Hoozer will be called, if at all, only to lay foundation for the "Notice of Opposition." (Defendants' Exh. D–206).

This motion is taken under advisement, and will be determined at trial in the event the defendants decide to call Mr. Van Hoozer. The court instructs counsel to approach the bench prior to calling Mr. Van Hoozer as a witness.

*of America*, 211 U.S.P.Q. 28, 40, 1981 WL 40539 (N.D.Cal.1981) (trademark and unfair competition). Those cases indicate that a defendant cannot defend a trademark infringement claim on the theory that the plaintiff's rights to the mark may be junior to the rights of some third person.

## VI. *FBS FINANCIAL'S USE OF DEFENDANTS' TRADEMARK*

Plaintiff next requests that the court exclude evidence of the mark used by First Bank System Financial,[7] a subsidiary of defendants, because that mark has not been used in plaintiff's territory since 1975, and has thus been abandoned. Plaintiff states that the Exhibits reflecting this mark include D–46, D–46A, D–46B, D–46–C, D–46D, D–46E, D–46F, and D–66.

Defendants have withdrawn Exhibit D–46, including all of its subparts. As to the other exhibits, including exhibit D–66, the defendants maintain this is evidence of their use of "First Bank System" as early as the 1970's as part of its banking presence in Kansas. The defendants intend to offer later evidence that they used the same or similar marks in promoting and conducting its other bank-related business in Kansas.

That the defendants have since abandoned those marks and terminated FBS Financial's headquarters in Kansas City does not conclusively determine the admissibility of this evidence. Just as the plaintiff wants to introduce evidence of its historical use of the trademarks in the claimed trade territory, the defendant is likewise entitled to introduce evidence of its historical use of its trademarks in areas near or in ways possibly impacting the same trade territory. Such evidence is admissible in proving the defendants' use of confusingly similar marks prior to the plaintiff obtaining secondary meaning in its mark. Accordingly, this motion is denied.

## PLAINTIFF'S MOTION TO STRIKE DEFENDANTS' MOTION IN LIMINE NO. (3)

The court denies this motion as the defendant's third motion in limine is not a thinly-veiled motion for partial summary judgment filed out of time. The defendants' in limine request is not anymore fact-bound than several of the plaintiff's in limine requests. Nor has the plaintiff been prejudiced by the defendants' motion in limine No. 3, as the court did not grant it.

IT IS THEREFORE ORDERED that defendants' motion in limine (Dk.340) is granted as to the request to exclude the testimony of David Miller on lost profits and the request to exclude the testimony of Kurt Eskilson on marketing damages; is granted in part as to the request to exclude evidence and argument that the plaintiff's mark is something other than the same mark described and used by the Tenth Circuit; and is denied as to the request to exclude evidence of the plaintiff's use of its mark after March 12, 1992;

IT IS FURTHER ORDERED that the plaintiff's motion in limine (Dk.342) is denied as moot as to the request to exclude advice of counsel testimony; is denied as to the request to exclude the defendants' use of prior federal trademark registrations, the request to exclude defendants' use of marks outside the five-county area, and the request to exclude evidence of the mark used by First Bank System Financial; and is taken under advisement as to the request to exclude Exhibit D–200 now numbered as D–206 and the request to exclude the testimony of Thomas Van Hoozer.

IT IS FURTHER ORDERED that the plaintiff's motion to strike defendants' motion in limine No. (3) (Dk.350) is denied.

---

**7.** Activity by FBS Financial was allegedly carried out under the mark First Bank System and Design, as shown in defendants' expired registration, No. 915,249.