**Everett L. STARLING, Plaintiff,**

v.

**UNION PACIFIC RAILROAD COMPANY, Defendant.**

No. 99–4181–JPO.

United States District Court, D. Kansas.

Sept. 13, 2001.

Jeffrey W. Jones, Gary E. Laughlin, Sloan, Listrom, Eisenbarth, Sloan & Glassman, Topeka, KS, Don C. Aldrich, Roger R. Roe, Jr., John D. Magnuson, Paula M. Kubisiak, Ronald J. Barczak, Yaeger, Jungbauer, Barczak, & Vucinovich, PLC, Minneapolis, MN, for plaintiff.

Ronald W. Fairchild, Topeka, KS, John S. Johnston, Michael D. Moeller, Matthew E. Turner, Paul M. Quin, Shook, Hardy & Bacon L.L.P., Kansas City, MO, for defendant.

### MEMORANDUM AND ORDER

O'HARA, United States Magistrate Judge.

#### I.  Introduction.

This is an action under the Federal Employers Liability Act (FELA), 45 U.S.C. §§ 51–60.  Plaintiff Everett L. Starling claims that on July 2, 1997, in the course of his employment as a train conductor for defendant Union Pacific Railroad Company (Union Pacific), he was injured when the

locomotive on which he was working collided with another train on a railroad siding west of Topeka, Kansas. Plaintiff claims that, as a result of the train collision, he injured his back and also that he now suffers from post-traumatic stress disorder (PTSD), which has rendered him unable to work. Union Pacific denies plaintiff was on the train at the time of the collision, and further contends that, even if he was on the train, his injuries are not as extensive as he claims.

The trial of this case is scheduled to begin soon. Several motions have been filed and remain pending. After considering the parties' briefs and oral arguments, the court is now prepared to rule on the pending motions.

First, pursuant to Fed.R.Civ.P. 56, plaintiff has filed a motion for summary judgment (doc. 147), which is limited to two issues: (1) whether Union Pacific's running its train past a so-called "red block" (the railroad equivalent of a red light on a street) violated 49 C.F.R. § 240.305(a)(1), constituting negligence per se, thereby resulting in strict liability under 45 U.S.C. § 51 for all damages caused in whole or in part by its negligence; and (2) whether Union Pacific's alleged violation of 49 C.F.R. § 240.305(a)(1) bars defendant from asserting plaintiff's contributory negligence by virtue of 45 U.S.C. § 53. Plaintiff requests that the court enter summary judgment on the issues of liability and contributory negligence, leaving only the questions of causation and damages for the jury.

Second, pursuant to Fed.R.Civ.P. 26(a)(2)(B) and Fed.R.Civ.P. 37(c)(1), Union Pacific has filed motions seeking to preclude plaintiff from introducing at trial the testimony of: (1) Ethan Bickelhaupt, M.D., a psychiatrist (doc. 149); (2) Gale Gardner Sparkman, M.S.W., a social worker-therapist (doc. 151); and (3) Joseph G. Sankoorikal, M.D., a physical medicine specialist (doc. 153). Even though Dr. Bickelhaupt is a board-certified psychiatrist, whom plaintiff proposes to call to testify about his diagnosis and treatment of plaintiff for PTSD, Union Pacific argues his proposed testimony is improper under Fed.R.Evid. 702 and 703, and the Supreme Court's rulings in *Daubert v. Merrell Dow*

*Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

Finally, both parties have filed non-expert motions in limine. Plaintiff seeks to exclude at trial any reference to or evidence of: (1) plaintiff's receiving railroad retirement, sickness, or disability benefits, or any payments from any private insurance company or other collateral source; (2) the criminal records of plaintiff or any of his witnesses; (3) plaintiff's prior marriages and divorces; and (4) materials received from the National Transportation and Safety Board (NTSB) (doc. 158). Union Pacific seeks to exclude at trial any reference to or evidence that FELA is the only manner for railroad employees to be compensated for on-the-job injuries, and that workers' compensation benefits are unavailable to railroad employees (doc. 163).

## II. Plaintiff's Motion for Summary Judgment.

### A. Applicable Procedural Standards.

Summary judgment is appropriate if the moving party demonstrates there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The court must view the evidence and all reasonable inferences that may be drawn from that evidence in the light most favorable to the nonmoving party. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is material if, under the applicable substantive law, it is essential to the proper disposition of the claim. *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). An issue is genuine if there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way. *Id.* (citing *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and that it is entitled to judgment as a matter of law. *Id.* at 670–71 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317,

323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). In meeting that standard, a movant who does not bear the ultimate burden of persuasion at trial need not negate the other party's claim, but must simply point out to the court that the other party lacks evidence on an essential element of its claim. *Id.* at 671 (citing *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548). Once the movant has met this initial burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *accord Adler,* 144 F.3d at 671. The nonmoving party may not simply rest upon its allegations to satisfy its burden. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; *Lopez v. LeMaster,* 172 F.3d 756, 759 (10th Cir.1999). Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler,* 144 F.3d at 671 (internal quotation omitted). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, it must be noted that summary judgment is no longer regarded as a "disfavored procedural shortcut." Instead, summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

## B. Analysis and Discussion.

The Secretary of Transportation has promulgated the Federal Railroad Administration (FRA) regulations, which are published at 49 C.F.R., Subpart B, Chapter II, parts 200–50. Part 240 governs certification of locomotive engineers. The stated purpose of these regulations is to ensure that only qualified persons operate locomotives or trains. 49 C.F.R. § 240.1(a). The regulations prescribe minimum safety standards for all locomotive engineers to whom the regulations apply. 49 C.F.R. § 240.1(b).

One of the regulations provides: "It shall be unlawful to ... [o]perate a locomotive or train past a signal indication, excluding a hand or radio signal indication or a switch, that requires a complete stop before passing it...." 49 C.F.R. § 240.305(a)(1). It is uncontroverted in this case that the train on which plaintiff claims to have been working ran through a red block shortly before it collided with another train. Plaintiff argues that running the red block violated federal law and that Union Pacific should be found negligent per se because 49 C.F.R. § 240.305(a)(1) is a safety statute specifically aimed at the railroad industry. In this regard, plaintiff cites *Crane v. Cedar Rapids & Iowa City Ry. Co.,* 395 U.S. 164, 89 S.Ct. 1706, 23 L.Ed.2d 176 (1969) (involving a suit by a non-employee against a railroad under the Federal Safety Appliance Act for injuries sustained when he fell from a boxcar); *Kernan v. Am. Dredging Co.,* 355 U.S. 426, 78 S.Ct. 394, 2 L.Ed.2d 382 (1958) (discussing FELA principles and applying them to a seaman's case under the Jones Act); and *Ries v. Nat'l R.R. Passenger Corp.,* 960 F.2d 1156 (3rd Cir.1992) (holding that a railroad's violation of the Occupational Safety and Health Act did not constitute negligence per se that barred contributory negligence in a FELA action).

Plaintiff relies on 45 U.S.C. § 53 which, in pertinent part, provides that "no ... employee who may be injured ... shall be held to have been guilty of contributory negligence in any case where the violation by ... [a] common carrier of any statute enacted for the safety of employees contributed to the injury ... of such employee" (emphasis added). Plaintiff argues that, if an employee covered by FELA is injured, and if that injury is caused in whole or in part by the railroad's violation of an FRA statute or regulation, then the railroad is strictly liable and it may not assert contributory negligence as a defense. In this situation, the only question left for the jury, other than damages, is whether the violation of the statute or regulation caused or contributed to some injury or damage sustained by the plaintiff. *See Walden v. Ill. Cent. Gulf R.R.,* 975 F.2d 361, 364 (7th Cir.1992); *Eckert v. Aliquippa & S. R.R. Co.,* 828 F.2d 183, 187 (3rd Cir.1987).

Union Pacific vehemently disputes that plaintiff is entitled to summary judgment.

However, it is significant to note that Union Pacific's brief (doc. 155) does not make much effort to refute the notion that the running of a red block constitutes a violation of 49 C.F.R. § 240.305(a)(1). Further, the court is unpersuaded by Union Pacific's argument that, as a matter of law, 49 C.F.R § 240.305(a)(1) does not constitute a "safety statute" within the meaning of 45 U.S.C. § 53.

The crux of Union Pacific's position is that, even assuming for the sake of discussion that both of the above-described legal issues were ruled in plaintiff's favor, summary judgment is unwarranted because, viewing the record in the light most favorable to Union Pacific, there are genuine factual issues with regard to whether plaintiff was even on the train at the time of the collision, and also whether plaintiff's negligence may have been the sole cause of the violation of the safety regulation. As explained below, the court agrees with Union Pacific on this issue.

As Union Pacific correctly points outs, the court technically could deny plaintiff's motion for failure to comply with D. Kan. R. 56.1, which requires a statement of uncontroverted facts organized in separately numbered paragraphs. *See, e.g., Griffin v. Bank of Am.,* 971 F.Supp. 492, 495 (D.Kan.1997) (denying a motion for summary judgment for failure to comply with D. Kan. R. 56.1). The court will decline to so rule, as plaintiff's brief at least contains separate paragraphs with statements of fact accompanied by citations to the record. All that is missing are numbers for each of those paragraphs. Moreover, it is clear that Union Pacific understands plaintiff's contentions regarding the material facts, as Union Pacific responded to plaintiff's motion with citations to the record concerning certain factual contentions that are in dispute.

This is a case of first impression with regard to the issues raised in plaintiff's motion for summary judgment. Although both parties cited numerous cases involving the issue of whether violations of certain regulations amounts to negligence per se, counsel agreed during oral argument that none of the cases unearthed by their research involved the unusual situation involved in this case—

i.e., where there is a factual dispute about whether the plaintiff was even on the job at the time of the accident.

As a practical matter, although the court is inclined to rule in plaintiff's favor on the legal questions of whether running the red block violated 49 C.F.R. § 240.305(a)(1) and whether 49 C.F.R. § 240 .305 constitutes a "safety statute" within the meaning of 45 U.S.C. § 53, it is unnecessary to make either of those rulings at this juncture. Even if the court were to rule on both issues in plaintiff's favor, the court agrees with Union Pacific that summary judgment is unwarranted because the record, viewed in a light most favorable to Union Pacific at this procedural juncture, indicates there are at least two genuine issues of material fact.

First, there is the threshold issue of whether plaintiff was acting within the scope of his employment for Union Pacific when the two trains collided. That is, here the question is whether plaintiff, as he contends, was working as a train conductor at the time of the collision or whether, as Union Pacific contends, plaintiff actually got off the train to which he was assigned some time earlier in violation of the railroad's rules and in dereliction of plaintiff's duties as an employee. *See, e.g., Feichko v. Denver & Rio Grande W. R.R. Co.,* 213 F.3d 586, 592–93 (10th Cir. 2000) (stating that a FELA plaintiff must show he was injured in the scope of his employment); *Goldwater v. Metro–North Commuter R.R.,* 101 F.3d 296, 298 (2d Cir. 1996) (recognizing that whether a FELA plaintiff was acting within the scope of his employment ordinarily should be determined by the jury "based on all surrounding circumstances"); *Wilson v. Chicago, Milwaukee, St. Paul, & Pac. R.R. Co.,* 841 F.2d 1347, 1354–57 (7th Cir.) (determining that summary judgment was not warranted because of a factual issue regarding whether plaintiff was acting within the scope of his employment), *cert. dismissed,* 487 U.S. 1244, 109 S.Ct. 1, 101 L.Ed.2d 953 (1988).

Second, even if this threshold factual issue were resolved in plaintiff's favor, the record shows there is another genuine issue of material fact. This involves whether plaintiff's duties as a conductor placed him in charge of

the train and, thus, made him responsible for ensuring the engineer was alert and capable of doing the engineer's job, thereby preventing the train from running the red block. *See, e.g., Walden*, 975 F.2d at 364 ("Proof that the employee's own negligence was the *sole* cause of his or her own injury is a valid defense because it eliminates the possibility that the regulatory violation contributed in whole or in part to the injury." (emphasis in original)). Here, viewing the record in the light most favorable to Union Pacific, it is plausible that the engineer became incapacitated before arriving at the red block and, through no fault or negligence on his part, failed to stop the train. Under this factual scenario, Union Pacific argues, it would have been plaintiff's duty as conductor—and plaintiff's duty alone—to take over the situation and prevent the train from running the red block.

For the reasons stated above, the summary judgment requested by plaintiff is inappropriate. Accordingly, plaintiff's motion (doc. 147) is denied. However, in their trial briefs and proposed jury instructions, the parties should be prepared to address in more detail to what extent and how the above-described issues should be addressed by the jury at trial. Specifically, but not by way of limitation, if the jury were to find that plaintiff indeed was working as a conductor on one of the two trains when they collided, and if the jury were further to find that plaintiff's own alleged negligence was not the *sole* cause of his injuries, should the court make a finding of negligence per se and enter judgment as a matter of law for plaintiff on the issues of Union Pacific's duty and breach of duty, leaving only the questions of causation and damages for the jury? This would appear to be the result indicated by *Walden*, on which both parties rely, and which held that the railroad's violation of an FRA radio regulation could, under certain circumstances, constitute negligence per se. 975 F.2d at 364.

1. Don C. Aldrich entered his appearance for plaintiff on November 20, 2000 (doc. 100). Plaintiff's former lead counsel, Roger R. Roe, Jr., formerly of the same Minneapolis law firm, has

### III. Union Pacific's Motions to Preclude Expert Testimony.

#### A. Background.

On July 17, 2000, plaintiff filed disclosures for sixteen potential expert witnesses, including Ms. Gardner Sparkman, Dr. Sankoorikal, Dr. Bickelhaupt, and thirteen other individuals (doc. 20). In addition to other designated experts, Union Pacific specifically challenged the three witnesses who are the subject of the instant motions. On September 22, 2000, after extensive briefing by the parties, the court ruled that plaintiff's July 17, 2000 expert witness disclosures did not comply with Rule 26(a)(2)(B) (doc. 61 at 4). Although the court found plaintiff's failure to comply was not substantially justified and was prejudicial to Union Pacific, the court granted plaintiff additional time to prepare new reports in compliance with Rule 26(a)(2)(B). *Id.* at 6–7.

As explained in more detail below, as a practical matter, the key issue now before the court is whether Ms. Gardner Sparkman and Drs. Sankoorikal and Bickelhaupt are "treating physicians" within the meaning of Rule 26(a)(2) and, hence, not required to provide expert witness reports outlining their anticipated trial testimony. Plaintiff, who is now represented by a different lead attorney than earlier,[1] contends that all three witnesses are treating physicians. Union Pacific disagrees, contending that all three witnesses actually are retained experts.

When this issue first arose in September of 2000, the court declined to rule which of plaintiff's then-sixteen designated experts were required to provide reports. However, the court stated:

> As a practical matter, plaintiff would be well-served to err on the side of caution with regard to whom the Court will deem treating physicians (for whom plaintiff claims no written report is required under Fed.R.Civ.P. 26(a)(2)(A)), as contrasted with whom the Court will deem specially retained experts (for whom plaintiff admits

ceased to play any role in this case, although he has neither sought nor been granted leave to withdraw.

that a signed report is required under Fed.R.Civ.P. 26(a)(2)(B)).

. . . .

... Simply stated, the Court wants to give plaintiff a reasonable opportunity to promptly—and completely—remedy his failure to comply with Rule 26(a)(2).

(doc. 61 at 6–7).

On October 2, 2000, in response to the court's September 22, 2000 rulings, plaintiff (through Mr. Roe) filed amended expert witness disclosures (doc. 68). These disclosures contained no reports for Ms. Gardner–Sparkman or Dr. Sankoorikal, consistent with plaintiff's current position that neither of those witnesses falls in the category of a retained expert. However, these disclosures did contain a report signed by Dr. Bickelhaupt, implicitly suggesting that at least Mr. Roe regarded the anticipated scope of Dr. Bickelhaupt's testimony as extending beyond that of a treating physician and into the realm of a retained expert. However, as noted above, plaintiff is now represented by a new lead attorney.

In an attempt at "damage control," i.e., to make the case more manageable in light of what transpired under Mr. Roe's watch, Mr. Aldrich represents that he has radically pared down plaintiff's case to reduce the number of plaintiff's injury claims,[2] thereby narrowing the need for and the scope of proposed expert testimony. Among other things, Mr. Aldrich proposes to limit Dr. Bickelhaupt's testimony to his capacity as a treating physician and nothing beyond that role, despite the substantially broader manner in which Mr. Roe evidently intended to utilize that witness.

B. Applicable Procedural Standards.

■ Under Fed.R.Evid. 702, expert testimony is allowable if the witness is qualified as an expert and his or her specialized knowledge "will assist the trier of fact to understand the evidence or to determine a fact in issue." The court has a "gate-keeping" obligation to determine the admissibility of all expert testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (citing *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). Expert testimony is admissible only if it is both relevant and reliable. *Id.*

Rule 702 was amended in December of 2000 in response to *Daubert* and its progeny, including *Kumho Tire*. Rule 702 now allows expert opinion testimony if: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." The focus is on the principles and methodologies, not the conclusions generated. However, when an expert reaches conclusions "that other experts in the field would not reach, the trial court may fairly suspect that the principles and methods have not been faithfully applied." Fed. R.Evid. 702 advisory committee's notes (citing *Lust v. Merrell Dow Pharms., Inc.*, 89 F.3d 594, 598 (9th Cir.1996)). Therefore, the court must look at principles and methods, and how they have been applied to the facts of this case.

■ Reliability analysis applies to all aspects of the expert's testimony, including the facts underlying the opinion, the methodology, and the link between the facts and the conclusion drawn. *Heller v. Shaw Indus.*, 167 F.3d 146, 155 (3d Cir.1999). Consequently, the court must make a practical, flexible analysis of the reliability of the testimony, considering relevant factors and the circumstances of the case. *See, e.g., Kumho Tire*, 526 U.S. at 149–52, 119 S.Ct. 1167; *Heller*, 167 F.3d at 155. The court has discretion how to approach the task of making reliability findings. *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. 1167; *Goebel v. Denver & Rio Grande W. R.R. Co.*, 215 F.3d 1083, 1087 (10th Cir.2000); *United States v. Velarde*, 214 F.3d 1204, 1208–09 (10th Cir.2000). It is essential, however, to make a determination on the record that is sufficient to allow a reviewing court to determine whether the

___

2. Specifically, plaintiff has withdrawn any claim of "brain injury, closed head injury, or brain

damage." (Pretrial Order (doc. 146) ¶ 4.0(3).)

trial court properly applied the relevant law. *Goebel,* 215 F.3d at 1087–88; *Velarde,* 214 F.3d at 1209.

■ In making its reliability determination, the trial court may use the *Daubert* factors and ask the following types of questions: (1) Has the theory or technique been tested (or can it be)? (2) Has it been subjected to peer review and publication? (3) Is there a known or potential high rate of error and are there standards controlling the techniques of operation? (4) Is the theory or technique generally accepted within the relevant community? *Kumho Tire,* 526 U.S. at 149, 119 S.Ct. 1167. However, it must be kept in mind that these factors are not exclusive and may not apply in many cases. Indeed, in a case like this one where the challenged experts are offered or at least characterized as treating physicians, these factors are a bit unwieldy. In any event, "nothing ... requires the district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner,* 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

An expert may offer an opinion even if it "embraces an ultimate issue to be determined by the trier of fact." Fed.R.Evid. 704. Even after *Daubert,* rejection of expert testimony has been the exception rather than the rule. As reiterated by the advisory committee's notes to the 2000 amendments to Fed. R.Evid. 702: " 'Vigorous cross-examination, presentation of contrary evidence and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.' " (quoting *Daubert,* 509 U.S. at 595, 113 S.Ct. 2786). Nevertheless, an expert may not simply tell the jury what result it should reach. *United States v. Simpson,* 7 F.3d 186, 188 (10th Cir.1993). Such expert testimony is often excluded on the grounds that it states a legal conclusion, thereby usurping the jury's function in deciding facts, or interfering with the judge in instructing the law. All of these rationale define evidence which is not helpful

to the jury. *Id.* at 188–89. Such expert testimony does not assist the jury to "understand the evidence or to determine a fact in issue." Fed.R.Evid. 702.

C. Analysis and Discussion.

Of course, given the procedural history and current posture of this case, even before engaging in the *Daubert* "gate-keeping" function,[3] the court must determine whether plaintiff has arrived properly at the so-called gate. This depends on whether plaintiff has complied with Rule 26(a)(2) of the Federal Rules of Civil Procedure as it applies to Dr. Bickelhaupt, Ms. Gardner Sparkman, and Dr. Sankoorikal. This rule provides:

> (A) In addition to the disclosures required by [Fed.R.Civ.P. 26(a)(1) ], a party shall disclose to the other parties the identity of any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence.
>
> (B) Except as otherwise stipulated or directed by the court, this disclosure shall, with respect to a witness who is retained or specially employed to provide expert testimony in the case or whose duties as an employee of the party regularly involve giving expert testimony, be accompanied by a written report prepared and signed by the witness. The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

Fed.R.Civ.P. 26(a)(2).

The Federal Rules of Civil Procedure contemplate strong penalties if a party fails to

---

**3.** As earlier indicated, Union Pacific's only direct *Daubert* challenge concerns Dr. Bickelhaupt, the psychiatrist.

comply with the expert witness disclosure requirements of Rule 26(a)(2):

A party that without substantial justification fails to disclose information required by Rule 26(a) ... is not, unless such failure is harmless, permitted to use as evidence at trial ... any witness or information not so disclosed. In addition to or in lieu of this sanction, the court, on motion and after affording an opportunity to be heard, may impose other appropriate sanctions. In addition to requiring payment of reasonable expenses, including attorney's fees, caused by the failure, these sanctions may include any of the actions authorized under Rule 37(b)(2)(A), (B), and (C) and may include informing the jury of the failure to make the disclosure.

Fed.R.Civ.P. 37(c)(1).

■ In determining whether Ms. Gardner Sparkman and Drs. Sankoorikal and Bickelhaupt are experts from whom reports are required, or whether they are treating physicians from whom no reports are necessary, the parties agree that "the determinative issue is the scope of the proposed testimony." *Wreath v. United States,* 161 F.R.D. 448, 450 (D.Kan.1995). In *Wreath,* Magistrate Judge Ronald C. Newman explained that a treating physician is not always a specially retained expert witness for purposes of Rule 26(a)(2)(B), i.e., to the extent the physician limits his or her testimony to the patient's care and treatment, the physician is not "specially retained" despite the fact that the witness may offer opinion testimony under Fed. R.Evid. 702, 703, and 705. *Id.* On the other hand, when the proposed testimony extends beyond the facts made known to the physician during the course of the patient's care and treatment, and the witness is specifically retained to develop opinion testimony, he or she becomes subject to Rule 26(a)(2)(B). *Id.*

■ Union Pacific acknowledges that a treating physician need not be disclosed as an expert from whom a report is required when the physician is to testify regarding information acquired not "in preparation for trial but rather because he was an actor or viewer with respect to the transactions or occurrences that are part of the subject matter of the lawsuit." *Patel v. Gayes,* 984 F.2d 214, 217 (7th Cir.1993). Further, Union Pacific acknowledges that a treating physician may testify about that which is related to and learned through actual treatment of the plaintiff, and which is based on his or her "personal knowledge of the examination, diagnosis and treatment." *Mangla v. Univ. of Rochester,* 168 F.R.D. 137, 139 (W.D.N.Y. 1996).

1. Ms. Gardner–Sparkman and Dr. Sankoorikal.

According to plaintiff's second amended trial witness list (doc. 131) filed on March 14, 2001, plaintiff presently intends to call Ms. Gardner Sparkman to testify as follows:

She will describe her course of treatment, and her weekly meetings with Mr. Starling. She will explain exactly how PTSD affects his daily activities and how much he has improved over the course of her care. She will explain how the symptoms of PTSD impair a person's daily activities.

*Id.* at 4.

Also, plaintiff presently intends to call Dr. Sankoorikal to testify as follows:

He will describe the mechanism of injury, and that Mr. Starling's injuries are the result of the accident. He will describe the various tests and imaging done of Mr. Starling's back and nervous system, and the significance of the findings. He has placed a lifting restriction on Mr. Starling, and will testify as to why and how he arrived at that conclusion. He will testify that Mr. Starling's limitations are permanent. He will testify in general as to back problems and explain how back injuries occur, and the possible treatments available.

*Id.* at 3–4.

Union Pacific evidently fears Ms. Gardner Sparkman and Dr. Sankorrikal will actually testify at trial in a much broader fashion, consistent with plaintiff's July 17, 2000 expert witness disclosures which, as earlier indicated, the court found deficient. According to plaintiff's original filing, Ms. Gardner–Sparkman (along with Dr. Bickelhaupt and Herbert Goldman, Ph.D., a neuropsychologist

whom plaintiff has now withdrawn) was originally expected to testify as follows:

> [A]s to the nature and extent of Mr. Starling's mental and emotional injuries, the diagnosis of depression, post traumatic stress disorder in closed head injuries; that the injuries resulted in permanent disability, care and treatment for the injuries, prognoses, future medical care and treatment, future medical expenses, and the causal relationship of these work related injuries sustained on July 2, 1997. It is believed that … [Ms. Gardner Sparkman] will testify that Mr. Starling is unable to perform the duties of a railroad trainman and has associated restrictions which will impair him vocationally, recreationally, and emotionally.… [H]er testimony and opinions will be based on … examinations of plaintiff, plaintiff's medical records, plaintiff's ongoing treatment, and … [her] education, training, knowledge and experience in treating closed head injuries and mental disorders.

(doc. 20 at 2–3.)

Also according to plaintiff's original filing, Dr. Sankoorikal (along with David J. Schreiber, M.D. (a neurologist) and George R. Schoedinger, III, M.D. (an orthopedist), both of whom plaintiff has since withdrawn as expert witnesses), was originally expected to testify as follows:

> [A]s to the nature and extent of Mr. Starling's orthopedic and neurologic injuries, the diagnoses, that the injuries resulted in permanent disability, care and treatment for the injuries, prognoses, future medical care and treatment, future medical expenses, and the casual relationship between the crash of July 2, 1997, and the injuries diagnosed. It is believed that [Dr. Sankoorikal] will testify that Mr. Starling is unable to perform the duties of a railroad trainman and has associated restrictions which will impair him vocationally and recreationally.

*Id.* at 1–2.

Union Pacific's complaints about Ms. Gardner–Sparkman and Dr. Sankoorikal are similar. Union Pacific's main objection is that these two witnesses should not be considered treating physicians because plaintiff's counsel provided them with so much material prepared by plaintiff's present and withdrawn retained expert witnesses that they have both been rendered unable to testify based solely upon their own personal observations. In this regard, Union Pacific further argues that Ms. Gardner Sparkman and Dr. Sankoorikal, as retained experts, have complied with neither the court's September 22, 2000 Order nor Rule 26(a)(2)(B) with regard to the filing of reports and, therefore, their proposed testimony should be stricken pursuant to Rule 37(c)(1).

In a related vein, Union Pacific argues Ms. Gardner–Sparkman and Dr. Sankoorikal have been designated to testify in areas far beyond their personal knowledge, including causation, which Union Pacific asserts is impermissible for a treating physician in any event. For example, Union Pacific argues Ms. Gardner–Sparkman and Dr. Sankoorikal should be precluded from testifying in any way about how plaintiff is now purportedly limited in performing the actual duties of a railroad trainman, because there has been no showing that either of these witnesses knows anything about those duties. In this regard, Union Pacific relies on *Zarecki v. Nat'l R.R. Passenger Corp.*, 914 F.Supp. 1566, 1573 (N.D.Ill.1996). The court agrees with Union Pacific in the limited sense that, if these witnesses purport to testify specifically or in any detail about what a railroad trainman's job entails, a reasonable foundation would need to be laid before any such testimony could be elicited, as the record presently does not indicate these witnesses have that kind of knowledge. Presumably, however, an otherwise qualified social worker or physical medicine specialist could opine about the ability of their patient to perform specific acts or job tasks.

■ As noted above, Union Pacific also has objected to the extent that Ms. Gardner Sparkman or Dr. Sankoorikal might be called upon to testify about the issue of causation. Union Pacific argues there is no indication that either of these witnesses has learned anything about causation from anything other than outside sources, including the statements of plaintiff's counsel and the opinions of other expert witnesses. Accordingly, cit-

ing *O'Conner v. Commonwealth Edison Co.,* 13 F.3d 1090, 1105 n. 14 (7th Cir.1994), and *Porter v. Whitehall Labs., Inc.,* 9 F.3d 607, 613 (7th Cir.1993), Union Pacific argues that, even if these two witnesses are deemed treating physicians, they should not be treated differently from those experts from whom a report is due to the extent their testimony concerns causation. Here, though, Union Pacific fails to mention, let alone analyze, *Wreath,* which involved a situation where this court approved the notion of a treating physician testifying not only about the nature and extent of the patient's damages but also about the cause of those damages. 161 F.R.D. at 449. Further, as more fully explained in *Washington v. Arapahoe County Dep't of Social Servs.,* 197 F.R.D. 439, 442 (D.Colo.2000), the prevailing weight of au-

thority today is that, to the limited extent that opinions about the cause of an injury are a necessary part of a patient's treatment, treating physicians may opine on causation without triggering any need for a full-blown Rule 26(a)(2)(B)-report.

Union Pacific's second major objection is that to allow Ms. Gardner–Sparkman and Dr. Sankoorikal to testify, presumably having relied upon opinions of plaintiff's other retained expert witnesses who have been withdrawn, would unfairly and improperly allow plaintiff to introduce these other experts' opinions without having complied with Rule 26(a)(2)(B). In this regard, Union Pacific points out that many records and documents related to plaintiff's prosecution of this case were provided by Mr. Roe to Ms. Gardner–Sparkman[4] and Dr. Sankoorikal.[5] These

4. Union Pacific's brief points out, without challenge by plaintiff, that Mr. Roe provided Ms. Gardner Sparkman the following documents:

1. Laser print photographs allegedly showing "the aftermath" of the train collision.
2. A narrative from plaintiff's wife, Shelley Starling, dated September 14, 1998, which outlines her observations of her husband's problems.
3. Records from Shawnee County Fire District No. 3 and a Medivac responder from American Medical Response.
4. Records related to physical therapy at St. Francis Hospital in Topeka, Kansas.
5. October 23, 1997 correspondence from Joseph M. Stein to Richard Draskovich regarding plaintiff's participation in investigating the accident.
6. Medical records and consultation reports of Dr. Sankoorikal from Midwest Rehabilitation Associates.
7. October 17, 1997, October 24, 1997, October 29, 1997, and November 5, 1997 nephrology consultations of Dr. Dennis Artzer.
8. Dr. Stein's report of July 28, 1997, and other records contained in the Meriden Clinic records.
9. July 30, 1997 correspondence of Dr. Sankoorikal to Dr. Gregory Matlock, D.O., reflecting observations of plaintiff, diagnosis, and recommendations for treatment.
10. Records of care and treatment provided by Dr. Bickelhaupt.
11. Records of Dr. Schoedinger.
12. Expert reports of Drs. Goldman and Schoedinger.
13. Expert reports of Drs. Goldman, Schreiber, and Schoedinger.
14. Medical records of an October 24, 1997-evaluation of plaintiff by Dr. Joseph M. Stein, carbon-copied to Dr. Bickelhaupt and containing a recitation of the findings of Ms. Gardner-

Sparkman and Drs. Goldman and Schoedinger.
15. Records of Dr. Goldman concerning a neuropsychological evaluation of plaintiff.
16. Reports from Dr. Bickelhaupt and Ms. Gardner–Sparkman.
17. Letter from Dr. Goldman addressing plaintiff's participation in Union Pacific's investigation.
18. Copy of Dr. Goldman's report dated September 17, 1997.
19. Initial report of Dr. Schoedinger dated September 16, 1997.
20. Deposition transcript of Dr. Schreiber, and functional capabilities evaluation ordered by Dr. Schoedinger.
21. Reports of Allan Rypka including review of plaintiff's Vietnam experience.
22. Final report of Dr. Schreiber of September 27, 2000.
23. Final report of Dr. Richardson of September 25, 2000.
24. Expert report of Dr. Erin Bigler, Ph.D., pertaining to neuropsychological examination of plaintiff.

5. Similarly, the record indicates that Mr. Roe provided Dr. Sankoorikal with the following documents:

1. Report of Dr. Schreiber.
2. Functional Capacities Evaluation prescribed by Dr. Schoedinger.
3. Dr. Schreiber's deposition.
4. Expert reports of Drs. Goldman, Schreiber, and Schoedinger.
5. Laser print photographs allegedly showing "the aftermath" of the train collision.
6. Records from Shawnee County Fire District No. 3 and a Medivac responder from American Medical Response.
7. Records related to physical therapy at St. Francis Hospital in Topeka, Kansas.

documents most notably include reports by a neurologist (Dr. Schreiber) and an orthopedist (Dr. Schoedinger), both of whom, as noted above, were withdrawn by plaintiff's counsel after Union Pacific successfully challenged the sufficiency of the disclosures concerning those two witnesses.

With regard to Ms. Gardner Sparkman and Dr. Sankoorikal, and for that matter with regard to Dr. Bickelhaupt, too, Union Pacific vociferously complains that Mr. Roe provided these witnesses with so much extraneous material that there is no possible way they can reasonably be expected to now put that material out of their minds and testify to the limited extent of their purported roles as treating physicians. The court respectfully disagrees. Although Union Pacific pointed out one or two instances when these experts voiced hesitancy during their depositions about separating precisely what they learned from any particular source, Union Pacific has fallen far short of proving this problem exists across the board for any of the three witnesses. Nor has Union Pacific cited any precedent which would suggest that, as a matter of law, these witnesses must be precluded from testifying because they were somehow "tainted" by reading draft reports from other experts plaintiff prudently decided to jettison. Indeed, a case cited by Union Pacific in opposing plaintiff's motion in limine concerning the extent to which accident reports by the National Transportation and Safety Board may be used in cases such as this one, *Mullan v. Quickie Aircraft Corp.*, 797 F.2d 845, 848 (10th Cir.1986), suggests there is no basis to infer as a matter of law that an expert witness (whether he or she is a treating physician or a retained expert) cannot put aside such material.

■ In any event, the court understands and appreciates Union Pacific's practical concern that, at trial, plaintiff may attempt to run an "end around" on Rule 26(a)(2), i.e., by having Ms. Gardner–Sparkman and Dr. Sankoorikal testify about draft reports they may have received from potential testifying experts whom plaintiff was forced to withdraw in response to Union Pacific's earlier objections and the court's rulings concerning same. Accordingly, the court rules that no such testimony shall be allowed at trial by either of these witnesses. This specifically includes, but is not necessarily limited to, expert opinions or reports developed by Dr. Schoedinger (the orthopedist), Dr. Schreiber (the neurologist), and Dr. Goldman (the neuropsychologist).

This, of course, does not necessarily mean that every scrap of paper Ms. Gardner Sparkman or Dr. Sankoorikal may have received from one or more of plaintiff's now-withdrawn expert witnesses may not be mentioned at trial. The court's intent here is merely to address Union Pacific's well-founded concern about plaintiff running an "end around" play to get procedurally defective, withdrawn reports into evidence. Provided plaintiff can lay an appropriate foundation with regard to any discrete tests or data that may have been performed or generated by the other experts, and if that foundation further demonstrates that such facts or data are of the type reasonably relied upon by experts who testify in forming opinions on the subject at hand, that would appear permissible. *See* Fed.R.Evid. 703. That said, plaintiff would be wise to err on the conservative side

---

8. Dr. Stein's report of July 28, 1997, and other records contained in the Meriden Clinic records.

9. Records of care and treatment provided by Dr. Bickelhaupt.

10. Records of Ms. Gardner Sparkman.

11. Records of Dr. Schoedinger.

12. Records of Dr. Goldman concerning a neuropsychological evaluation of plaintiff.

13. Reports from Dr. Bickelhaupt and Ms. Gardner Sparkman.

14. A narrative from plaintiff's wife, Shelley Starling, dated September 14, 1998, which outlines her observations of her husband's problems.

15. St. Francis Hospital Records, including emergency room treatment of July 2, 1997, and July 7, 1997.

16. Outpatient physical therapy records and outpatient speech pathology records.

17. Report of September 17, 1997, of Neuropsychological Diagnostics, Inc. (Dr. Goldman).

18. Report of Dr. Gary H. Myers of September 22, 1997.

19. EEG of September 30, 1997, of Dr. Schreiber.

because, to carry the metaphor one step further, the court will not hesitate to throw a game-ending "flag" if it becomes apparent plaintiff is running the feared end-around play.

### 2. Dr. Bickelhaupt.

Dr. Bickelhaupt is a psychiatrist for whom plaintiff's prior lead counsel originally submitted a report ostensibly in compliance with Rule 26(a)(2)(B). The record reflects that, early in this case, at least Mr. Roe regarded Dr. Bickelhaupt as more than a mere treating physician. For example, on February 2, 2000, Mr. Roe wrote a letter to Dr. Bickelhaupt and informed him that he was required to submit a report as well as other information. Mr. Roe even provided Dr. Bickelhaupt with copies of pertinent portions of Rule 26(a)(2)(B). Dr. Bickelhaupt's purported expert witness report was among those which plaintiff filed on July 17, 2000, and which led to the above-described challenge by Union Pacific to plaintiff's then-sixteen designated experts. On October 2, 2000, plaintiff filed his new expert witness reports, supposedly in compliance with the court's earlier directive. He listed Dr. Bickelhaupt as one of among nine retained experts. Plaintiff's October 2, 2000 disclosures contained a purported report of Dr. Bickelhaupt dated September 27, 2000. Union Pacific later established, during Dr. Bickelhaupt's deposition, that this report was actually prepared by Mr. Roe and sent to Dr. Bickelhaupt for Dr. Bickelhaupt's signature. This draft report contained statements that Dr. Bickelhaupt admitted during his deposition he had no knowledge of, because the report had been prepared by Mr. Roe. Mr. Aldrich, however, now claims he has restructured and limited the case, specifically so that Dr. Bickelhaupt's testimony will be limited to his role as a treating physician.

With regard to Dr. Bickelhaupt, Union Pacific specifically argues as follows:

1. He is a retained expert.

2. He must be held to the constraints of any retained expert, i.e., he cannot testify to opinions or bases for opinions not set forth in his expert report.

3. He should not be allowed to rely upon opinions of retained experts that plaintiff has withdrawn from the case.

4. He is not an expert in the areas he intends to testify, and consequently his opinions should be precluded.

5. He has offered no scientific support for his opinions, and consequently his opinions should be precluded.

6. His personal recollections cannot be separated from his review of inadmissible and unreliable materials provided by plaintiff's counsel in his role as a retained expert, and consequently his testimony should be precluded.

Although not dispositive, a threshold question is whether Dr. Bickelhaupt started treating plaintiff before the July 2, 1997 train collision at issue in this case. Union Pacific argues he was hired after the collision to testify in support of this case. However, it appears from the record that some form of physician-patient relationship between plaintiff and Dr. Bickelhaupt existed before the accident in question. The only genuine dispute between the parties concerns how long before the accident that relationship began.

Turning to Union Pacific's more pressing complaint, based upon the parties' written submissions, the court believes there is insufficient reason at this time to rule that, as matter of law, Dr. Bickelhaupt will be unable to confine his testimony to his role as a treating physician, irrespective of the written materials he may have received from Mr. Roe. As before, the court understands Union Pacific's concern that plaintiff may attempt to run an "end around" play on Rule 26(a)(2) by having this particular expert witness testify about draft reports he may have received from potential testifying experts whom plaintiff was forced to withdraw in response to earlier objections and the court's rulings concerning those objections. The court's comments above in this regard, in the context of Ms. Gardner Sparkman and Dr. Sankoorikal, shall apply to Dr. Bickelhaupt with equal force.

Finally, the court is unpersuaded by Union Pacific's argument that Dr. Bickelhaupt's proposed testimony, as limited by the court above, nevertheless somehow runs afoul of

*Daubert* or Fed.R.Evid. 702. As indicated above, Dr. Bickelhaupt is a board-certified psychiatrist with academic experience and training dealing with PTSD. He has treated hundreds of patients with PTSD. Based on the record provided by the parties,[6] at this juncture it appears to the court that Dr. Bickelhaupt's proposed testimony is based upon sufficient facts or data, that his testimony is the product of reliable principles and methods, and that he has applied those principles and methods reliably to the facts of this case. Putting aside for now whether Union Pacific's cross-examination of Dr. Bickelhaupt may impair or effectively destroy his credibility, he appears to be qualified. Further, it appears his specialized knowledge may assist the jury to understand the evidence or to determine a fact in issue, including but not limited to whether plaintiff actually suffers from PTSD or whether he merely suffers from antisocial personality disorder.

### IV. The Parties' Non–Expert Motions in Limine.

#### A. Applicable Procedural Standards.

In *First Savings Bank v. U.S. Bancorp,* 117 F.Supp.2d 1078 (D.Kan.2000), Judge Sam A. Crow concisely summarized the law governing motions in limine in federal practice as follows:

> The motion in limine is a creature of neither the Federal Rules of Civil Procedure nor the Federal Rules of Evidence. *Deghand v. Wal–Mart Stores, Inc.,* 980 F.Supp. 1176, 1179 (D.Kan.1997). Such motions do "aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial." *Palmieri v. Defaria,* 88 F.3d 136, 141 (2d Cir.1996) (quoting *Banque Hypothecaire Du Canton De Geneve v. Union Mines, Inc.,* 652 F.Supp. 1400, 1401 (D.Md.1987)). They also may save the parties time, effort and costs of preparing and presenting their cases. *Pivot Point Intern., Inc. v. Charlene Products, Inc.,* 932 F.Supp. 220, 222 (N.D.Ill.

1996). At the same time, it is the better practice to wait until trial to rule on objections when admissibility substantially depends upon what facts may be developed there. *See Sperberg v. Goodyear Tire & Rubber Co.,* 519 F.2d 708, 712 (6th Cir. 1975), *cert. denied,* 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 303 (1975); *Hunter v. Blair,* 120 F.R.D. 667 (S.D.Ohio 1987).

The movant has the burden of demonstrating that the evidence is inadmissible on any relevant ground. *Plair v. E.J. Brach & Sons, Inc.,* 864 F.Supp. 67, 69 (N.D.Ill. 1994). The court may deny a motion in limine when it "lacks the necessary specificity with respect to the evidence to be excluded." *National Union v. L.E. Myers Co. Group,* 937 F.Supp. 276, 287 (S.D.N.Y.1996). At trial, the court may alter its limine ruling based on developments at trial or its sound judicial discretion. *Luce v. United States,* 469 U.S. 38, 41, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984). "Denial of a motion in limine does not necessarily mean that all evidence contemplated by the motion will be admitted at trial." *Hawthorne Partners v. AT & T Technologies, Inc.,* 831 F.Supp. 1398, 1401 (N.D.Ill.1993). Denial only means that the court cannot decide admissibility outside the context of trial. *Plair v. E.J. Brach & Sons, Inc.,* 864 F.Supp. at 69. A ruling in limine does not "relieve a party from the responsibility of making objections, raising motions to strike or making formal offers of proof during the course of trial." *Thweatt v. Ontko,* 814 F.2d 1466, 1470 (10th Cir.1987) (internal quotation omitted). 117 F.Supp.2d at 81–82. In ruling on the parties' motions, the court will follow and endeavor to apply these standards.

As a preliminary note, the court is inclined to agree with Union Pacific that plaintiff's motion is defective because it lacks the necessary specificity with regard to exactly what evidence he seeks to exclude. However, in the interest of expediting this case and avoiding unnecessary delays during trial, the court will proceed to address what it perceives to be the thrust of plaintiff's evidentiary arguments.

---

**6.** Neither party has requested a formal (i.e., evidentiary) *Daubert* hearing.

B.  Plaintiff's Motion in Limine.

1.  Railroad Retirement Benefits and Other Collateral Source Payments.

■ Railroad employees are covered by the Railroad Retirement Act of 1974(RRA), 45 U.S.C. § 231. To qualify for an occupational disability annuity, an employee must have either twenty years of service or must be sixty years old and have ten years of service. 45 U.S.C. § 231A(a)(1)(iv). Plaintiff is qualified to receive, and has been receiving, railroad retirement benefits. Further, regardless of whether plaintiff prevails in this FELA action, his right to receive railroad retirement disability payments evidently will not be affected.

Plaintiff is concerned that Union Pacific may place before the jury the fact that he has been and will continue to receive railroad retirement benefits. Plaintiff argues it long has been held that railroad retirement, sickness, and disability benefits provided under the RRA fall within the collateral source rule and cannot be used as a setoff by railroad defendants in FELA cases. *See, e.g., Eichel v. N.Y. Cent. R.R. Co.*, 375 U.S. 253, 255, 84 S.Ct. 316, 11 L.Ed.2d 307 (1963); *Green v. Denver & Rio Grande W. R.R. Co.*, 59 F.3d 1029, 1033 (10th Cir.), *cert. denied,* 516 U.S. 1009, 116 S.Ct. 565, 133 L.Ed.2d 490 (1995). Beyond railroad retirement benefits, plaintiff also argues that any private insurance payments he may have received fall within the collateral source rule and thus may not be used as an offset by Union Pacific. *See Patterson v. Norfolk & W. Ry. Co.*, 489 F.2d 303, 307–08 (6th Cir.1973) (citing *Haughton v. Blackships, Inc.*, 462 F.2d 788 (5th Cir. 1972)).

In its response to plaintiff's motion on this issue (doc. 168), Union Pacific essentially acknowledges, by its silence, that the collateral source rule effectively bars all evidence or mention at trial about any private insurance payments plaintiff may have received. With regard to RRA benefits, however, Union Pacific advances the creative argument that the Supreme Court's decision in *Eichel,* as well as the Tenth Circuit decision in *Green,* need not be followed in the instant case. The gist of Union Pacific's argument is that, because a certain recent government report purported-ly verifies that approximately 75% of all RRA disability benefits are funded by Union Pacific and other railroads, those benefits do not originate from an "independent source" and instead are "somehow identified with the tortfeasor." *Green,* 59 F.3d at 1032. In essence, Union Pacific argues that, because the above-described financial data upon which it relies was not available when *Eichel* and *Green* were decided, the present case is distinguishable and, thus, those precedents are not binding.

The court is wholly unpersuaded that *Eichel* and *Green* are not binding. Accordingly, any reference to or evidence of plaintiff having received railroad retirement, disability, or sickness benefits, or payments from any private insurer or other collateral source, shall be excluded at trial.

2.  The Criminal Records of Plaintiff and His Witnesses.

■ Plaintiff fears Union Pacific may seek to impeach his credibility or the credibility of certain unnamed witnesses with evidence of past criminal conduct, pursuant to Fed.R.Evid. 608 and 609. As far as the unnamed witnesses are concerned, without knowing who they are, what their testimony might be, or what kind of conduct or convictions Union Pacific might try to impeach them with, plaintiff has chosen to leave the court in the dark. Thus, in those respects, plaintiff's motion must be denied, at least for now. *See, e.g., First Sav. Bank,* 117 F.Supp.2d at 1082 ("The court may deny a motion in limine when it lacks the necessary specificity with respect to the evidence to be excluded." (quotation omitted)).

■ Insofar as this kind of impeachment of plaintiff is concerned, his motion refers to a charge of child abuse that evidently did not result in a conviction. As such, plaintiff argues the child abuse charge is inadmissible under Fed.R.Evid. 609, and that it would have no bearing on his credibility. In this regard, plaintiff relies on *McDonald v. Hewitt,* 196 F.R.D. 650, 652 (D.Utah 2000).

Union Pacific's twelve-page responsive brief on this issue (doc. 169) is conspicuously silent about the child abuse charge. Signifi-

cantly, Union Pacific does not challenge plaintiff's assertion that the charge did not result in a conviction, whether misdemeanor or felony. Nor does Union Pacific put forth any argument about how the mere fact of the child abuse charge might be relevant to any of the claims presented in this case, or how it could properly be used against plaintiff under Fed.R.Evid. 608 or 609. To this very limited extent, plaintiff's motion is granted. The court believes this evidence is irrelevant and, even if it were relevant, its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, and by considerations of undue delay and waste of time. *See* Fed. R.Evid. 403.

Beyond the issue of the child abuse charge, Union Pacific's responsive brief points out that plaintiff's motion on the issue of prior criminal acts (whether alleged or adjudicated) cannot be reconciled with the parties' stipulations regarding various trial exhibits. The pretrial order in this case stipulates to the admissibility of at least three of Union Pacific's exhibits which refer in part to plaintiff's criminal history.

■ In any event, the court agrees with Union Pacific that plaintiff's motion, read literally, casts with too broad of a net. Instead of merely attempting to impeach plaintiff's credibility, some evidence of plaintiff's prior criminal conduct (irrespective of whether it resulted in conviction) may be relevant to plaintiff's factual contention that the train collision of July 2, 1997, caused him emotional problems that are now manifested by PTSD. In this regard, Union Pacific proposes to prove plaintiff's post-collision behaviors are not the result of PTSD but, rather, are consistent with plaintiff's pre-existing antisocial personality disorder, according to the diagnosis of one of Union Pacific's retained experts in this case. Upon reviewing the parties' written submissions, the court is inclined to believe this evidence may be relevant and, further, that no Rule 403–considerations warrant its exclusion at this early juncture.

### 3. Plaintiff's Prior Marriages and Divorces.

■ Plaintiff anticipates Union Pacific may attempt to offer negative character evidence, specifically, concerning his prior marriages or divorces. Plaintiff argues this would be irrelevant and, in any event, unfairly prejudicial. He points out that courts in FELA cases have exercised great caution in permitting evidence of conduct which might unfairly bias jurors against a claimant. *See, e.g., Boyer v. Chicago & N.W. Transp. Co.,* 603 F.Supp. 132, 134 (D.Minn.1985). Specifically, plaintiff argues that courts in other jurisdictions have held that evidence pertaining to a party's marital difficulties, divorce, and remarriage has been properly excluded at trial in unrelated personal injury claims. *See, e.g., Nastasi v. United Mine Workers of Am. Union Hosp.,* 209 Ill.App.3d 830, 153 Ill.Dec. 900, 567 N.E.2d 1358, 1367 (1991).

Here again, Union Pacific's responsive brief (doc. 170) initially points out that plaintiff's motion on this point cannot be reconciled with the parties' stipulations regarding certain trial exhibits. The pretrial order in this case stipulates to the admissibility of exhibits identified by Union Pacific which specifically refer to plaintiff's marriages and divorces, as well as his various other marital difficulties.

More to the point, however, Union Pacific's opposition to plaintiff's motion in limine on this point is similar to its position concerning plaintiff's criminal history. Union Pacific argues it should be able to plumb the depths of plaintiff's various failed marital relationships—some of which were before and some of which were after the July 2, 1997–train collision—to rebut plaintiff's factual contention that the 1997–train collision caused him to suffer emotional problems. More directly, Union Pacific intends to present evidence of plaintiff's consistent, long-standing difficulties with relationships to rebut his claims in this case. Additionally, Union Pacific intends to present evidence through some of the women with whom plaintiff was involved to support Union Pacific's claims that plaintiff staged his purported involvement in the 1997–train accident.

The court, having reviewed the cases cited and relied upon by plaintiff, finds them dis-

tinguishable. Those cases involved physical injuries, materially different from the case at bar, in which plaintiff's main complaint is that he suffers from PTSD. The court believes Union Pacific should be accorded the opportunity to present evidence of plaintiff's domestic relationships and, ultimately, try to prove that plaintiff suffers from anti-social personality disorder instead of PTSD.

The court is unpersuaded that any Rule 403 considerations preclude evidence of this type. That said, however, the court strongly encourages both parties to streamline such evidence to the extent possible.

4. Materials Received From the NTSB.

■ Finally, plaintiff seeks to exclude at trial any material obtained by the parties from the NTSB, specifically, approximately twenty-five documents that are included among Union Pacific's listed trial exhibits. In this regard, plaintiff relies on the purported general rule that, consistent with the NTSB's fact-finding mission, which is litigation neutral, NTSB reports are barred as evidence in court. *See* 49 U.S.C. § 1154(b).[7] Section 1154(b) provides: "No part of a report of the Board, related to an accident or an investigation of an accident, may be admitted into evidence or used in a civil action for damages resulting from the matter mentioned in the report." *See also Thomas Brooks Chartered v. Burnett*, 920 F.2d 634, 639 (10th Cir.1990) (discussing § 1154). Anticipating Union Pacific's argument that it only seeks to introduce transcript testimony and certain exhibits which were used by the NTSB (as opposed to the NTSB's ultimate report), plaintiff counters that this transcript testimony and these exhibits form a part of that report and thus must be excluded.

Plaintiff has not cited any authority to support the proposition that anything beyond the actual written NTSB report might be barred from being used as evidence in court. Union Pacific's responsive brief on this issue (doc. 171) correctly points out that plaintiff obscures a critical distinction between the

opinion section of an NTSB report dealing with the probable cause of an accident (which Union Pacific concedes is inadmissible in the present case), and the remainder of the factual materials included in that report (which may be admissible). First, Union Pacific points out that, in the *Brooks* case cited by plaintiff, the Tenth Circuit was not confronted with a situation like that presented here, i.e., involving the admissibility of an NTSB report in a personal injury case to which the NTSB was not a party. Secondly, Union Pacific correctly points out that, despite the view expressed by some older federal cases outside the Tenth Circuit which discuss the rationale and effect of 49 C.F.R. § 1154(b), even under *Brooks* and now well-established modern federal precedent, there is no legal impediment to deposition testimony given by NTSB employees concerning factual information they obtained during the course of an accident investigation being used in litigation involving non-parties. Stated differently, the only parts of the NTSB report that are off limits are those that contain agency conclusions on the probable cause of an accident. *Mullan v. Quickie Aircraft Corp.*, 797 F.2d 845, 848 (10th Cir.1986); *Keen v. Detroit Diesel Allison*, 569 F.2d 547, 549–51 (10th Cir.1978); *American Airlines, Inc. v. United States*, 418 F.2d 180, 196 (5th Cir.1969); *Berguido v. Eastern Air Lines, Inc.*, 317 F.2d 628, 631–32 (3d Cir.1963); *Kline v. Martin*, 345 F.Supp. 31, 32 (E.D.Va.1972); 49 C.F.R. § 935.5. Finally, Union Pacific argues that, under the applicable regulations, the NTSB does not object to or claim that any statute or regulations bars the admission of "factual accident reports," as distinguished under the regulations from that part of the report containing the NTSB's determination of the accident's probable cause. *See* 49 C.F.R. § 835.2.

Upon consideration of the parties' arguments on this issue, the court is unpersuaded by plaintiff's motion. Therefore, although Union Pacific shall not introduce into evidence or even refer to any opinions on probable causation that may be contained in the

---

7. The first version of this statute appeared at 49 U.S.C. § 581. That statute was later codified at 49 U.S.C. § 1441(e), and is currently codified at 49 U.S.C. § 1154(b). Accordingly, although

plaintiff's supporting memorandum on this issue (doc. 162) refers to 49 U.S.C. § 1441(e), the proper current citation is 49 U.S.C. § 1154(b).

**486**

NTSB report, Union Pacific is not precluded from utilizing the above-referenced exhibits, at least on the narrow basis asserted by plaintiff.

### C.  Union Pacific's Motion in Limine.

Union Pacific filed its motion in limine, fearful that plaintiff might make some reference at trial to the effect that FELA is the only vehicle through which railroad employees can be compensated for on-the-job injuries, or that workers' compensation benefits are unavailable to railroad employees.  Union Pacific argues that such statements would be irrelevant and unfairly prejudicial, and therefore should be excluded.  *See Stillman v. Norfolk & W. Ry. Co.*, 811 F.2d 834, 838 (4th Cir.1987); *Weinell v. McKeesport Connecting R.R. Co.*, 411 F.2d 510, 512 (3rd Cir.1969); *Kodack v. Long Island R.R. Co.*, 342 F.2d 244, 247 (2d Cir.1965); *Snyder v. Lehigh Valley R.R. Co.*, 245 F.2d 112 (3rd Cir.1957).  In his response (doc. 167), plaintiff candidly concedes that Union Pacific's motion is well-taken.  Accordingly, plaintiff shall not be allowed to make any such references or present any such evidence at trial.

### V.  Conclusion and Order.

In summary and conclusion, plaintiff's motion for summary judgment (doc. 147) is denied.  Union Pacific's motions to preclude the testimony of Dr. Bickelhaupt (doc. 149), Ms. Sparkman (doc. 151), and Dr. Sankoori-kal (doc. 153) are denied.  However, the testimony of all three of these witnesses at trial shall be strictly limited to the subjects outlined in plaintiff's second amended witness list (doc. 131) and in plaintiff's brief with regard to the instant motions (doc. 156), all as further limited above.  Plaintiff's counsel shall explain in detail and provide a copy of the court's ruling to these witnesses to ensure they do not inadvertently mention or volunteer any information the court has prohibited.  If the court's Order in limine is violated, and if inappropriate material is placed before the jury, the court will entertain a motion for mistrial by Union Pacific.  Finally, plaintiff's motion in limine (doc. 158) is granted in part and denied in part, consistent with the discussion set forth above, and

Union Pacific's motion in limine (doc. 163) is granted.

IT IS SO ORDERED.